John K. CASTLE, et al. **Plaintiffs,**

and

**Federal Deposit Insurance Corporation, as Successor to the Rights of Western Empire Savings and Loan Association, Plaintiff–Intervenor,**

v.

**The UNITED STATES, Defendant,**

No. 90–1291 C.

United States Court of Federal Claims.

Nov. 9, 2000.

Reissued for Publication Dec. 5, 2000.

Order Denying Reconsideration
Nov. 30, 2000.

John C. Millian, Gibson, Dunn & Crutcher LLP, Washington, D.C., attorney of record for plaintiffs. Mark A. Perry and Paul

Blankenstein, Gibson, Dunn & Crutcher LLP, Washington, D.C., of counsel.

Thelma W. Diaz, Federal Deposit Insurance Corporation, Washington, D.C., attorney of record for intervenor-plaintiff. John Thomas, Stephen Kessler, and Ellis Merritt, Federal Deposit Insurance Corporation, Washington, D.C., of counsel.

Ming–Yuen Meyer–Fong, with whom were Acting Assistant Attorney General David W. Ogden, Director David M. Cohen, Paul Freeborne, Linda Halpern, Matthew D. Lee, Scott Pivnick, Jane Peterson, and Ho Sik Shin, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant.

## OPINION

WIESE, Judge.

Part I
- The Timeliness of the FDIC's Intervention .................................... 193
- The FDIC's Standing to Intervene........................................... 195
 - i. The Receivership Deficit ............................................... 198
- Shareholder-Plaintiffs' Right to Seek Lost Profits.............................. 199

Part II
- Expectation Interest ...................................................... 200
 - i. Causation .......................................................... 200
 - ii. Foreseeability ...................................................... 205
 - iii. Reasonable Certainty ................................................ 206
- Alternative Damages Calculation .......................................... 214
- Restitution Interest....................................................... 215
- Fifth Amendment Taking................................................... 217

## INTRODUCTION

This case comes before the court as one of more than a hundred pending suits known collectively as the *Winstar* litigation, each involving an agreement executed in the late 1980s between a savings and loan institution (a "thrift") and the federal government. In *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), the Supreme Court ruled that Congress's passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (codified as amended in various sections of 12 U.S.C.), had the effect of breaching the Winstar Corporation's contract with the government by, among other things, withdrawing the assurances of special regulatory treatment that the corporation had received from federal regulators as part of its contract for the takeover of a failed thrift.

The ruling in *Winstar* was subsequently extended to this case in a decision on cross-motions for summary judgment entered by Chief Judge Smith on February 2, 1999. *Castle v. United States*, 42 Fed.Cl. 859 (1999). Following that decision on liability, the case was transferred to the undersigned judge for the conducting of all further proceedings, including the determination of damages. Based on the testimony developed during the course of a lengthy trial, the court now concludes that plaintiffs are entitled to an award in restitution of $15,122,360.

## FACTS

This case arises out of the savings and loan crisis of the late 1980s, a more complete discussion of which can be found in *United States v. Winstar Corp.*, 518 U.S. 839, 844–848, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). For our purposes, it is sufficient to note that rising interest rates in the latter years of that decade caused the insolvency of a number of savings and loan institutions, as short-term costs for attracting new deposits far exceeded the income being earned on earlier-generated mortgages. As the insurer of thrift deposits, the Federal Savings and Loan Insurance Corporation (FSLIC) was thus faced with the likelihood of having to liquidate hundreds of failing thrifts at a cost well in excess of that agency's then-existing funding capability. In an effort to avoid bankruptcy of the insurance fund, FSLIC therefore entered into a series of contracts with both private investors and healthy thrifts, encouraging them to assume responsibility

for the ailing institutions. These agreements—and their subsequent breach by FIRREA—now form the basis for the *Winstar* litigation.

It was against this background that Western Empire Savings and Loan Association ("Western Empire" or "the bank"), a two-branch savings and loan located in Irvine, California, found itself financially insolvent in late 1988. Attempts to find a buyer and shore up its capital base eventually led Western Empire into discussions with Castle Harlan, Inc. ("Castle Harlan"), a privately owned investment banking firm that was interested in acquiring a troubled thrift as a vehicle through which to invest in high-yield bonds (also known as "junk bonds"). After several months of negotiations with government regulators, Castle Harlan, acting on behalf of the 22 investors who became shareholders in the successor bank and who appear as plaintiffs in the present litigation, agreed to infuse Western Empire with up to $25 million in new capital in exchange for certain regulatory forbearances.[1]

The resulting contract—entered into in December 1988 and signed by the regulators, Castle Harlan, and the bank—promised special regulatory treatment to the bank in exchange for the takeover and recapitalization of the insolvent thrift.[2] As part of that agreement, Castle Harlan submitted a business plan whose operating strategy was relatively straightforward: investments in high-yield bonds (to take advantage of the spread between the bank's cost of funds and the yield from the bonds), supplemented by more traditional thrift functions such as residential mortgage originations and investments in mortgage-backed securities.

From the beginning, however, the bank's performance lagged behind the projections set forth in the business plan. Commercial real estate properties—acquired as the result of loan foreclosures—proved more costly and difficult to dispose of than anticipated; mortgage-origination rates fell short of those predicted, and long-term deposits—the initially-proposed funding source for the bank's high-yield bonds—proved unobtainable. Due in part to these initial difficulties, the Office of Thrift Supervision informed the bank's management in September 1989 that the bank had fallen out of tangible capital compliance (the requirement that the capital level be maintained at a minimum of 2% of total liabilities) and that, by the terms of its contract, it had 90 days in which to cure the deficiency. In response to this capital shortfall, Western Empire's management elected to shrink the bank's asset base, thus remedying its capital deficiency without having to face the necessity of raising additional capital.

On August 8, 1989, roughly eight months after Castle Harlan had commenced operation of the bank, FIRREA was enacted. Al-

---

1. In lieu of the $25 million in capital originally contemplated by the business plan, the bank began operations with only $12.5 million in equity (stock) and an additional $2.5 million in subordinated debt (bonds). Castle Harlan did expect, however, to attract the balance of the initially envisioned funding in the early months of 1989.

2. Essentially four promises made up the essence of the government's commitment:

 First, the contract specified that for a period of five years, the bank would be permitted to meet the *lesser of either the* standard regulatory capital requirements, or the "Modified Regulatory Capital" requirement set forth in the contract documents. The bank would additionally be subject to a two percent "Tangible Capital" requirement which, if not met, would trigger a 90-day cure period in which the bank would be required to return to capital compliance or be subject to seizure.

 Second, the contract provided that goodwill would be determined in accordance with purchase method accounting and could be amortized over a period of 20 years. The bank was also permitted to include goodwill, as well as preferred stock and subordinated debt, in its regulatory capital base.

 Third, the contract authorized the bank to invest up to 25% of its total assets in high-yield bonds during the first six months of operation, and up to 35% of its assets in high-yield bonds thereafter. Because the bonds were to be held for investment, it was understood that, under generally accepted accounting principles, the bank would be permitted to carry the high-yield bonds on its books at historical cost rather than the lower of cost or market ("LOCOM") as required when securities are "held for sale."

 Fourth, the contract exempted the bank from regulatory liability growth limitations for a period of two years in order to allow the bank to increase its assets more quickly and thus to generate greater income.

though plaintiffs initially believed that the regulators would be willing to strike a balance between the enforcement of FIRREA and the preservation of the essential components of the bank's business plan, that belief was short-lived.

In a letter dated October 23, 1989, the bank was advised by the regulators that its original business plan was "no longer practicable in the wake of the passage of [FIRREA]." The bank was instructed to sell off its high-yield bond portfolio and to come into compliance with the capital requirements introduced by FIRREA. Faced with this drastic revision of their business plan—the cornerstone of which was the ability to invest in and hold high-yield bonds—plaintiffs met in January 1990 to discuss alternatives for keeping the bank afloat. Having consulted with the original investors, each of whom expressed interest in contributing additional funds under "appropriate circumstances," Castle Harlan approached the regulators with a proposal to "spin off" the bond portfolio (*i.e.*, to restructure the portfolio as a separate, collateralized bond undertaking), and to replace these divested assets with cash and a promissory note. The regulators rejected this proposal.

In February 1990, the bank, having failed to achieve compliance with the new capital requirements imposed by FIRREA, was seized by regulatory authorities.

Plaintiffs filed suit in this court on September 25, 1990. In their complaint, plaintiffs contend that the enactment and implementation of FIRREA, combined with the subsequent seizure of the bank, constitute a breach of contract that entitles them either to an award of damages or to restitution. Plaintiffs also maintain, as an alternative to their contract-based claims, that the government's actions amount to a deprivation of their property rights for which they are owed just compensation under the Takings Clause of the Fifth Amendment.

The court has been asked to rule on each of plaintiffs' claims for monetary relief in order to minimize the possible need for a retrial following an appeal. We honor this request. By addressing, in the alternative, all of plaintiffs' theories of recovery, we hope not only to reduce the likelihood of future litigation in this action, but perhaps also to extend the usefulness of the opinion to other *Winstar* suits still awaiting resolution.

## DISCUSSION

### PART I

Before considering the case on its merits, we turn first to the various challenges raised by defendant in opposition to both the FDIC and the shareholder-plaintiffs' rights to pursue their claims in this court. Specifically, defendant maintains that the FDIC may not participate in this litigation because its motion to intervene was untimely, that the FDIC's prosecution of the present action is impermissible as it amounts to a suit by the government against itself, and that the bank, rather than the shareholder-plaintiffs, alone may pursue a claim for lost profits. We examine these contentions in turn.

### The Timeliness of the FDIC's Intervention

As mentioned above, the shareholder-plaintiffs first filed suit in this court on September 25, 1990. The FDIC, however, did not seek to intervene in this case until March 14, 1997—more than six years after the potential accrual date for *Winstar*-related contract claims recognized by the Federal Circuit's decision in *Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874 (Fed.Cir. 1998). That delay, in defendant's view, means that the FDIC is now barred under this court's six-year limitations period, 28 U.S.C. § 2501 (1994), from litigating its claim.

In response, the FDIC asserts that a tolling agreement reached between its predecessor and the government effectively suspends the running of the limitations period, so that its intervention under the agreement is timely. In the alternative, the FDIC argues that as the real party in interest, it may join the shareholder-plaintiffs' earlier-filed action, with its intervention relating back to the date of the original complaint. Of these arguments, we conclude that only the second has merit.

In describing its tolling agreement with the government, the FDIC explains that its statutory predecessor, the Resolution Trust Corporation ("RTC"), had entered into an agreement with the Department of Justice purporting to toll the running of the statute of limitations with respect to certain claims, referred to as the "Goodwill Claims," arising out of the contract breaches precipitated by the enactment of FIRREA. The FDIC maintains that under the terms of this agreement, the RTC (and now the FDIC) was granted a period of 130 days following the entry of a final judgment in the *Winstar* case in which to decide whether to initiate litigation as receiver for the failed thrift institutions. Since that cut-off date has not yet arrived, the FDIC insists that its joinder here in 1997 was timely.

 The difficulty with the FDIC's argument is that it presumes that the running of the statute of limitations can be tolled by mutual agreement of the parties. That position reflects a view of the law, however, to which we cannot subscribe. The limitations period applicable to the actions brought in this court is a condition that attaches to the sovereign's waiver of immunity from suit and "defines the limits of the ... court's jurisdiction to hear a claim against the United States." *Henderson v. United States,* 517 U.S. 654, 677, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996) (Thomas, J., dissenting). Moreover, those limits have been expressed in terms that admit of no qualification: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (1994). Given the explicitness of this statutory language and recognizing also that it is to be read "with that conservatism which is appropriate in the case of a waiver of sovereign immunity," *United States v. Sherwood,* 312 U.S. 584, 590, 61 S.Ct. 767, 85 L.Ed. 1058 (1941), this court is compelled to reject the notion that litigat-

ing parties can modify the terms that Congress has specified for the initiation of suits against the United States. "The matter is not one of procedure but of jurisdiction whose limits are marked by the Government's consent to be sued." *Id.* at 591, 61 S.Ct. 767. The FDIC's agreement with the Department of Justice to toll the statute of limitations is a legal nullity.

We turn then to the FDIC's second argument in support of the timeliness of its intervention—the assertion that, as the real party in interest, the FDIC may relate its date of filing back to the date of the shareholder-plaintiffs' originally filed claim. In support of this position, the FDIC relies primarily on this court's rule 17(a) (and its virtually identical federal rules counterpart), which provides that an action filed by a plaintiff other than the real party in interest may be amended to permit either the joinder or the substitution of the real party in interest, with the subsequent action to be treated as if it had been "commenced in the name of the real party in interest." RCFC 17(a).[3]

 In interpreting Rule 17(a), courts have uniformly held that where suit is commenced by one who arguably has an interest in the enforcement of the claim and the real party in interest is later brought into the litigation, the joinder or substitution of the real party in interest relates back for limitations purposes to the date of the original pleading. *See, e.g., South African Marine Corp. v. United States,* 640 F.Supp. 247, 253–54 (Ct. Int'l Trade 1986); *Prevor–Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Mgmt., Inc.,* 620 F.2d 1, 3 n. 2 (1st Cir.1980); *Link Aviation, Inc. v. Downs,* 325 F.2d 613, 614–15 (D.C.Cir.1963). As further explained in Wright's *Federal Practice and Procedure,* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane § 1555 (2d ed. 1990): "The final sentence in Rule 17(a) is designed to avoid forfeiture and injustice when an understandable mistake has been made in selecting

---

**3.** Under this court's Rule 17(a), an action may not be dismissed on the ground that it is not being prosecuted in the name of the real party in interest "until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substi- tution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest."

the party in whose name the action should be brought. Thus, a correction in parties is permitted even after the statute of limitations governing the action has run."

■ Defendant maintains, however, that the FDIC's intervention cannot relate back to the filing date of the original complaint because that complaint did not assert a claim on behalf of the failed thrift but rather a claim on behalf of the individual shareholders. As a result, defendant argues, "the FDIC cannot use the investor plaintiffs' complaint as a surrogate for [its] claim on behalf of [the bank]."

We cannot accept this contention. The core dispute presented in the complaint involves the government's breach, occasioned by the enactment of FIRREA, of specific contractual rights which the "FHLBB [Federal Home Loan Bank Board] granted Western Empire and its investors."[4] The source of these rights is identified as those "set forth in, *inter alia,* an Acquisition Approval Letter issued by FHLBB, and a Regulatory Capital Maintenance Agreement ... entered into by the 'new' Western Empire, plaintiffs Castle and Harlan, and FSLIC." In view of these recitals, there can be no question that the contract rights brought into issue in the complaint implicate the bank's rights at least to the same extent as those of the shareholder-plaintiffs. Therefore, the fact that the complaint filed sought recovery only in the name of the shareholder-plaintiffs (and not also the bank) can hardly provide a reason for saying that the FDIC should now be denied its rightful place in the litigation. The transaction sued on was a contract to which the bank was a party. Plainly, then, the bank had an interest in the subject matter of the suit. Hence, since the FDIC is the bank's successor-in-interest, the FDIC's in-

tervention must be judged to relate back to the date of the original complaint's filing.

### The FDIC's Standing To Intervene

■ Having concluded that the FDIC's intervention was timely, we turn now to the question of whether the FDIC is legally permitted to present the bank's claim. In challenging the FDIC's participation in this law suit, defendant has focused on two primary factors: the legal capacity in which the FDIC purports to prosecute this action (whether as the bank's receiver or as the manager of the FSLIC Resolution Fund)[5], and the nature of the receivership deficit claim the FDIC now asserts. Upon reflection, we are able to accept defendant's objections only as they pertain to the receivership deficit, and accordingly deem that receivership deficit (a full description of which we provide below) unrecoverable.

In analyzing the FDIC's proper role in this litigation, we begin with Judge Turner's decision in *Plaintiffs In All Winstar–Related Cases v. United States,* 44 Fed.Cl. 3 (1999).[6] Asked to determine the legitimacy of the FDIC's intervention in *Winstar* actions initiated by private plaintiffs, Judge Turner ruled that the FDIC could intervene as a matter of right since it bore the statutory obligation to "'take over the assets of ... the insured depository institution,' 12 U.S.C. § 1821(d)(2)(B)(i), and to 'collect all obligations and money due the institution.' 12 U.S.C. § 1821(d)(2)(B)(ii)." 44 Fed.Cl. at 7. Based on these statutory responsibilities, Judge Turner concluded that the "FDIC as receiver of the failed thrifts has a duty to join in these cases (or in some manner pursue the thrifts' claims by litigation) in order to recover any damages owed by the government to the failed thrifts." *Id.* at 8. The FDIC could not, however, be substituted as

---

**4.** The quoted material is taken from Paragraph 37 of the First Amended Complaint that was filed in this court on April 4, 1997.

**5.** The FSLIC Resolution Fund was created as part of the banking reforms instituted by FIRREA. *See* 12 U.S.C. § 1821a(a)(1) (1994). The fund, which is managed by the FDIC, is the transferee of the assets and the liabilities of the Federal Savings and Loan Insurance Corpora-

tion (FSLIC). The FSLIC was abolished by FIRREA.

**6.** By consensus of the litigants involved in the *Winstar*-related suits (memorialized in an Omnibus Case Management Order dated September 18, 1996), individual judges were assigned decisional responsibility with respect to common issues, the resolution of which was to apply to all of the pending *Winstar* cases.

the sole plaintiff to the exclusion of the shareholders, the court further held, since the shareholder-plaintiffs, suing derivatively, have "a direct, vested interest in the surplus of potential recoveries and, therefore, have standing to remain as plaintiffs in these actions notwithstanding FDIC's appearance on behalf of the failed thrifts." *Id.* at 11.

Defendant reads Judge Turner's decision as standing for the proposition that the FDIC may intervene only where the agency is acting in its capacity as the receiver for a failed thrift. In defendant's view, however, the FDIC appears here not as the receiver for Western Empire, but as the manager of the FSLIC Resolution Fund. It is thus defendant's belief that the FDIC, acting as the Resolution Fund manager and hence as an agency of the United States, cannot now bring suit against the United States, as it amounts to an action by the government against the government. Such intra-governmental disputes, defendant maintains, are simply non-justiciable.

Defendant's characterization of the FDIC as fund manager rather than as receiver derives from two sources. Defendant argues first that the FDIC is precluded from acting as receiver since the receivership estate was terminated on May 31, 1995—a date well before the FDIC's motion to intervene was filed in this court—and the claims the receiver possessed were sold to the Resolution Trust Company ("RTC") in its corporate capacity. In addition, defendant notes that the claim itself was ultimately transferred to the Resolution Fund, which the FDIC, by law, is charged with administering. 12 U.S.C. § 1821a(a)(1). Those factors, defendant concludes, confirm that the FDIC is acting here solely in the capacity of Resolution Fund manager—with the result, in defendant's view, that the government is impermissibly suing itself.

In assessing the legitimacy of defendant's argument, we begin with a brief chronology of the inter-agency transfers of the bank's claim. According to a stipulated order by the parties (the entirety of which is set forth below) [7], all of the bank's assets—including its breach of contract claim—were placed, after the bank's dissolution, into a receivership estate managed by the RTC as receiver. The RTC as receiver later assigned those claims to RTC in its corporate capacity and, within four month's time, terminated the receivership estate. The RTC corporate then ceased to exist pursuant to 12 U.S.C. § 1441a(m)(1) (1994) and its assets were transferred by statute to the FSLIC Resolution Fund. 12 U.S.C. § 1441a(m)(2). The FDIC, in turn, is now charged with the management of all claims residing in the Resolution Fund. 12 U.S.C. § 1821a(a)(1).

In light of that history, we cannot accept defendant's assertion that either the termination of the receivership estate or the transfer of the claim to the RTC corporate in any way constrains the FDIC's legitimate participation in this lawsuit. We are not aware of any authority that would suggest that the transfers of the claim among the various agencies reflected anything other than stages

---

7. The parties have stipulated to the following chronology tracing the bank's assets and liabilities:

On February 15, 1990, the Office of Thrift Supervision ("OTS") appointed the Resolution Trust Corporation ("RTC") as Receiver for Western Empire. On or about the same date, the OTS also issued a charter for a new thrift named Western Empire Federal Savings and Loan ("Western Empire Federal") for which the RTC was appointed Conservator (the "thrift in conservatorship"). On February 16, 1990, the RTC as Receiver for Western Empire entered into a contract (the "Purchase and Assumption Agreement") with the thrift in conservatorship, by which substantially all of the assets of Western Empire, including this and other claims owned by Western Empire, were transferred to Western Empire Federal.

The thrift in conservatorship operated until August 31, 1990, when the OTS appointed the RTC as Receiver for Western Empire Federal. On February 1, 1995 the RTC as Receiver for Western Empire Federal assigned to the RTC in its corporate capacity this claim and other assets remaining in the receivership (the "Assignment and Assumption Agreement"), and the receivership was terminated on May 31, 1995.

On December 31, 1995, the RTC itself ceased to exist, pursuant to 12 U.S.C. § 1441a(m)(1). Pursuant to 12 U.S.C. § 1441a(m)(2), all assets and liabilities held by the RTC in its corporate capacity as of December 31, 1995 were transferred to the FSLIC Resolution Fund.

in the administrative implementation of FIR-REA—a process that cannot be seen as substantively altering the claim itself. Indeed, in its capacity as manager of the FSLIC Resolution Fund, the FDIC is specifically granted "all rights, powers, and duties to carry out the Corporation's [FDIC's] duties with respect to the assets and liabilities of the FSLIC Resolution Fund that the Corporation otherwise has under this chapter." 12 U.S.C. § 1821a(a)(4). In other words, the FDIC has the same fiduciary duties and obligations with respect to the FSLIC Resolution Fund as it has as a receiver for an insured depository institution. Thus, the short answer to defendant's argument is that the FDIC is a participant in this lawsuit because it holds the bank's claim and is charged by law with pursuing it.

Defendant argues against this conclusion. It points out that the FDIC, when acting in its capacity as manager of the FSLIC Resolution Fund, is an agency of the United States; hence, to allow the FDIC, in that same capacity, to pursue the bank's breach of contract claim against the United States is to present the court with a non-justiciable intra-governmental dispute.

As proof that the government is essentially represented on both sides of the litigation and that any recovery would amount to a transfer merely from one government account to another, defendant points to the statutory scheme for the payment and receipt of *Winstar*-related sums. According to defendant, the FSLIC Resolution Fund is charged by statute with reimbursing the government for all expenses incurred in defending the *Winstar* litigation. *See* Pub.L. No. 105–61, § 632, 111 Stat. 1272, 1315 (1997); Pub.L. No. 104–208, § 638, 110 Stat. 3009–364 (1996). Additionally, the fund must provide all the monies paid out as judgments or

settlements in any of the *Winstar* suits. 12 U.S.C. § 1821a(d). Any shortfall in the fund's accounts, or any ultimate surplus, is to be made up by, or returned to, the United States Treasury. 12 U.S.C. § 1821a(c)(1), (f). Finally, defendant maintains that any recovery awarded by this court will be paid to the Resolution Fund, thus essentially positioning the fund on both sides of the litigation.[8]

What that tracing of funds ignores, however, is the nature of the underlying dispute. The FDIC's status as an agency of the United States when acting as manager of the FSLIC Resolution Fund is of no legal consequence here. Indeed, the FDIC holds that status even when it is acting in its capacity as a receiver for a failed depository institution. 12 U.S.C. § 1819(b)(1) (1994) ("The [FDIC], in any capacity, shall be an agency of the United States for purposes of section 1345 of Title 28....")[9] Rather, what makes a lawsuit a non-justiciable intra-governmental dispute is not a seeming identity between the parties, but the absence of those genuinely distinct adversarial interests between litigants that are the traditional earmarks of a case or controversy. *United States v. I.C.C.*, 337 U.S. 426, 430–431, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949) ("[C]ourts must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented."); *Navegar v. United States*, 103 F.3d 994, 998 (D.C.Cir.1997) ("[F]ederal courts act only when the disputes brought before them involve sharply defined issues pressed by truly adversary parties with a genuine stake in the outcome."). Clearly, the bank's breach of contract claim against the United States—seeking as it does the expectancy damages allegedly owed to the bank, and through the bank to its shareholders—meets these requirements.

---

**8.** It is unclear from the post-trial briefing whether defendant believes that an intra-governmental dispute arises only in connection with the FDIC's pursuit of the receivership deficit claim—*i.e.*, the claim for those funds that the RTC paid to the bank's depositors and which the FDIC now seeks to recover as subrogated creditor—or whether it extends that argument to the breach of contract claim in its entirety. In either event, we conclude that it is only the FDIC's pursuit of the receivership deficit claim that may legitimately

be characterized as a non-justiciable intra-governmental dispute.

**9.** The referenced statute, section 1345 of Title 28, grants the district courts original jurisdiction over "all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

Indeed, any other view would mean that the RTC as receiver essentially extinguished the bank's breach of contract claim when it transferred it to RTC corporate, since, under defendant's reasoning, the claim could no longer be vindicated by an agency of the United States. Neither the assignment agreement effecting the transfer of the claim nor the legislation governing the claim's disposition supports such a result. And we find that scenario particularly difficult to accept given that the FDIC is specifically charged with administering the claims in the FSLIC Resolution Fund. We are thus bound to conclude that the FDIC may indeed prosecute the bank's breach of contract claim.

### i. The Receivership Deficit

■ The rationale that allows the FDIC to seek recovery for the bank's contract claim, however, does not extend to the amount referred to as the receivership deficit. The receivership deficit claim, briefly described, identifies the amount by which Western Empire's liabilities (primarily the money owed to its depositors) exceeded the value received for its assets upon the bank's liquidation. That claim, defendant contends, suffers from the same infirmity defendant alleged of the breach claim: it represents an impermissible suit by the government against the government. Here, we believe, defendant is correct.

The $55.5 million identified as the receivership deficit comprises, in part, $26.5 million paid to the bank's depositors by the RTC, $24.2 million in interest on that amount, and approximately $1.8 million in administrative expenses (including the FDIC's present litigation costs) in winding up Western Empire's accounts. The FDIC claims this deficit as a loss suffered by the bank. Defendant, in contrast, characterizes that deficiency as made up of the bank's pre-existing liabilities—*i.e.* debts in the form of money owed to creditors or depositors—that cannot now be transformed, through a damages award to the bank, into assets of the bank. Further, the fact that the insurance

fund paid off the depositors (and in doing so became subrogated to their claims against the bank) means, in defendant's view, that the receivership deficit claim never belonged to the bank at all, but rather to the RTC as subrogee and then, by subsequent transfer, to the FSLIC Resolution Fund.[10] Finally, defendant notes, prosecution of the claim by the FDIC acting in its capacity as transferee of the RTC's rights as subrogee amounts to a claim against the government for money owed the government.

Defendant is of course correct that the liabilities owed to depositors were debts the bank itself had incurred prior to the breach. Plaintiffs are equally correct, however, that the forced sale of assets during a depression in both the real-estate and high-yield bond markets (as well as the fire-sale atmosphere created by the simultaneous closing of thrifts in the wake of FIRREA) likely resulted in a significant decrease in the value received for those assets. Yet, the various components of the receivership deficit—the payment to the depositors, the interest on that amount, and the subsequent expenses incurred in resolving the receivership estate—are ultimately claims *against* the bank, not claims *belonging* to the bank. We explain further.

Because the sale of the bank's assets upon dissolution was insufficient to meet the depositors' demands, the RTC, acting in its corporate capacity, paid off the outstanding deposits, and in doing so succeeded to the rights of the bank's depositors against the estate of the failed bank. The RTC corporate, in other words, became subrogated to the claims of the insured depositors. At the same time those payments were made, the RTC receiver entered into an assignment and assumption agreement that transferred to RTC corporate all of the assets and liabilities remaining in the receivership. Thus, by virtue of its ownership of the bank's assets, and its status as subrogee of the depositors' claim against the bank, RTC corporate became both an owner of and a creditor against the same institutional assets. It was in this

**10.** The RTC, having paid the bank's depositors, became subrogated to the depositors' claims against the bank. The RTC's interests, including its interests as subrogee, were subsequently transferred to the FSLIC Resolution Fund (the fund managed by the FDIC). 12 U.S.C. § 1441a(m)(2).

same joined status that these ultimately competing assets were passed on to the FSLIC Resolution Fund.

The receivership deficit now being claimed thus represents the loss absorbed by the insurer of the bank's depositors; not by the bank. Consequently, any recovery on the claim by the bank would, in fact, have to be paid over to the bank's creditor—in this case, the FSLIC Resolution Fund (the successor to the subrogee, RTC corporate). Put in practical terms, the FDIC is thus asserting a claim—the receivership deficit—that first will transfer money from the FSLIC Resolution Fund to the bank and then from the bank back to the Fund. FDIC, in effect, is suing itself. Such an action amounts to a non-justiciable intra-governmental dispute and, as such, may not go forward here.

### Shareholder–Plaintiffs' Right to Seek Lost Profits

■ In addition to taking issue with the FDIC's role in this lawsuit, defendant also challenges the right of the shareholder-plaintiffs to pursue a claim for expectation damages, *i.e.*, lost profits. Any expectation damages, defendant contends, belong not to the investors, but to the bank. And since the FDIC now purports to represent the bank's interests, defendant argues that the lost profits claim may be asserted by it alone. We are thus asked to rule that plaintiffs are precluded, as a matter of law, from pressing here their demand for lost profits. The FDIC joins in this request.

Plaintiffs do not dispute that the FDIC alone may pursue the bank's claim. In plaintiffs' view, however, the claim for expectation damages they are seeking is not the bank's claim, but rather their own. Plaintiffs contend that they have contract rights, independent of those held by the bank, for the breach of which they are now seeking recovery.

Plaintiffs trace the origin of these rights to two sources. First, they point out that both John K. Castle and Leonard M. Harlan were parties to the regulatory capital maintenance agreement (the basic contract document), where their signatures appear along with those of the representatives of the bank and the FSLIC. (The contract collectively identifies Messrs. Castle and Harlan as the "Acquirors.") Second, plaintiffs refer us to the earlier decision in this case (the decision on liability entered on February 2, 1999) in which Chief Judge Smith ruled that the "investor plaintiffs ... are third party beneficiaries of the contract." 42 Fed.Cl. at 866. Based on these two sources, then, the shareholder-plaintiffs assert that they possess contract rights that parallel the bank's own. To be more specific, plaintiffs contend that they are entitled to recover any lost profits the court might award, while the bank, they say, would be entitled to any recovery allowed with respect to the receivership deficit claim.

We do not agree with this position. Accepting, for the sake of argument, that plaintiffs in fact have an enforceable interest in the contract performance, we nevertheless fail to see how their status as third-party beneficiaries (or as signatories to the contract) can give them more than a right to sue here for the benefit of the bank. The contract performance that was promised was the granting of special regulatory forbearances which the government agreed to extend to the bank. And while plaintiffs could, of course, expect to benefit from that performance as the value of the bank grew, they held no rights to that performance for themselves. It was to the bank that the promised performance was to be rendered, not to the plaintiffs. Therefore, while plaintiffs' contract status would grant them a right to sue in the event of breach, they cannot claim more than they had in the first instance: a right to a benefit that can only come to them *through* the bank. Plaintiffs cannot lay claim to more than this, for the government promised nothing more. The lost profits claim belongs to the bank.

### PART II

We turn now to the substantive portion of the case—plaintiffs' claim for damages. Under traditional damages theory, an injured party has available to it several measures of recovery: its expectation interest, its reliance interest and its restitution interest. An injured party may thus seek to recover the value of the bargain—as measured by the

economic position it would have attained had performance been rendered (referred to as the "expectation interest"); the investment the injured party has made in performance—as measured by the economic position it would have been in had the contract not been made (referred to as the "reliance interest"); or the value of the benefit conferred on the breaching party (referred to as the "restitution interest"). Restatement (Second) of Contracts § 344 (1979).

### Expectation Interest

The principal claim put forward here, and the primary focus at trial, is a claim for lost profits—the profits the bank would have earned had its operations not been halted by FIRREA. The problem presented is one of reconstructing events as they might have been.

To accomplish this task, plaintiffs engaged the services of a number of experts, two of whom in particular—Dr. Donald Kaplan and Dr. Robert Losey—provided much of the testimony that is central to this case. Dr. Kaplan, who testified on behalf of the shareholder-plaintiffs, is a former Chief Economist of the Federal Home Loan Bank Board and has twenty-five years' experience as an economist analyzing the thrift industry. Dr. Losey, the FDIC's expert, is a former financial economist with the Federal Home Loan Bank Board and the Federal Savings and Loan Insurance Corporation, and currently serves as an associate professor and chairman of the Department of Finance and Real Estate at American University in Washington, D.C.

Starting with the core assumption that the bank would continue to pursue the basic lines of business set out in the business plan—investments in high-yield bonds, mortgage-backed securities, and residential mortgages—each expert developed a sophisticated, computer-based model showing the expected growth, over a period of years, in the bank's revenues, costs, and profits, using numbers drawn from market data. Although the methodology and structure of their respective models were much the same, the results derived from the models were not. Differences in input assumptions led to differences in predicted outcomes: Dr. Kaplan concluded, for instance, that over the ten-year period extending from January 1, 1989 through December 31, 1998, the bank would have realized post-tax earnings of $73.9 million.[11] Dr. Losey, by contrast, determined that, over the same ten-year period, the bank's post-tax earnings would have come to $36.3 million.

Defendant challenges the validity of both models saying that neither satisfies the requirements necessary to support an award of lost profits. Those requirements, set forth most notably in the Court of Claims decision in *Chain Belt Co. v. United States*, 127 Ct.Cl. 38, 115 F.Supp. 701, 714 (1953), are three: First, that the claimed loss be "the immediate and proximate result of the breach"; second, that the loss be within the contemplation of the parties either because it was "natural and inevitable upon the breach" or because it arose from "special circumstances ... known to the defaulting party at the time the contract was entered into"; and third, that there exist "a sufficient basis for estimating the amount of profits lost with reasonable certainty."

In defendant's view, the experts' models incorporate assumptions that either ignore or are inconsistent with these substantive requirements—causation, foreseeability, and reasonable certainty. While we conclude ultimately that plaintiffs' models fail only the third of those elements—the requirement of reasonable certainty—the importance of the first two issues warrants our full discussion of them as well.

### i. Causation

■ In its efforts to prove that FIRREA was not the proximate cause of plaintiffs' damages, defendant raises essentially two arguments, one grounded in law, the other in fact. With respect to legal causation, defendant maintains that the proximate cause

---

11. In addition to the $73.9 million he identified as lost profits, Dr. Kaplan's calculation of expectancy damages included $52.9 million for the receivership deficit and another $15.2 million which he identified as a franchise premium, *i.e.,* the dollar amount, in excess of book value, for which the bank could be sold to outside investors.

standard is satisfied only where there exists a nexus between the breach and any subsequent damage such that there exists "no intervening incident ... to complicate or confuse the certainty of the result between the cause and the damage." *Myerle v. United States*, 33 Ct.Cl. 1, 27, 1800 WL 2024 (1897). Again quoting *Myerle*, defendant elaborates on the point by emphasizing that "the cause must produce the effect inevitably and naturally, not possibly nor even probably.... There must not be two steps between cause and damage." *Id.*

These constraints, defendant asserts, have not been observed here. Rather, defendant notes that the starting point in each of the experts' models is an assumed capital infusion (by the original investors) of approximately $10 million—an augmentation of capital made necessary by losses experienced during the first twelve months of operation.[12] In defendant's view, the introduction of this factor into the experts' models introduces "two steps between cause and damage"; hence, the claimed damages cannot be said to result "inevitably and naturally" from the enactment of FIRREA. Instead, defendant describes these as damages from a "collateral undertaking"—a term used by the courts to describe damages for profits lost on transactions not directly related to the contract that was breached. *See, e.g., Wells Fargo Bank v. United States*, 88 F.3d 1012, 1022–23 (Fed.Cir.1996)(citing *Ramsey v. United States*, 121 Ct.Cl. 426, 101 F.Supp. 353 (1951), *cert. denied* 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952)) (ruling that the government's liability for breach of a loan guarantee contract could not include profits the bank might have earned from additional loans it would have been able to make had its lending capacity not been diminished by the government's failure to honor the guarantee).

We cannot accept defendant's argument. The statement in *Myerle* that defendant emphasizes in its brief—the prohibition on "two steps between cause and damage"—means only that, in the proof of damages, a party may not rely on transactions or occurrences that do not flow directly from the contract itself. Put differently, *Myerle's* requirement of a direct link between breach and injury is satisfied where subsequent events—including a capital infusion—can be seen as steps reasonably to be taken in pursuit of the business structure, methods and goals as set forth in the contract. The collateral undertakings envisioned by *Myerle* and *Wells Fargo* are those which fall outside of the scope of the original contract; proximate causation is thus compromised only where an *extra-contractual* transaction is interposed between the breach and any subsequent damage.

The issue, then, is one of constructing the course of events that might have evolved to fulfill the contract's purpose and comply with its terms. To the extent that a capital infusion represented the natural progression of the contract's fulfillment, it can be seen neither as a collateral transaction nor as an additional, impermissible step in the chain of causation. The question we ask, therefore, is whether the assumed infusion of an additional $10 million dollars by the bank's investors describes an event whose occurrence logically could be contemplated in light of the business structure described in the contract documents.

In answering that question in the affirmative, we look first to the bank as it was initially envisioned and second to the bank as it actually evolved. Under the business plan, Western Empire was originally to be funded with a $25 million capital base—to be divided equally between equity and subordinated debt. Although the bank in reality began operations with less than this amount ($15.1

12. In his model, Dr. Kaplan assumes a $10 million capital infusion in January 1990 in order to bring the bank into compliance with its 2% tangible capital requirement and thereby avoid seizure. Of that amount, Dr. Kaplan testified that $4.7 million would have been necessary immediately (*i.e.*, in January 1990) to ensure capital compliance, with the balance reserved to cover losses the bank would suffer in 1991. Dr. Losey, by contrast, assumed two infusions rather than one, each timed to cover a capital shortfall, and hence maintain capital compliance. Dr. Losey's model thus assumes a $5 million infusion in the first quarter of 1990 (which, as in Dr. Kaplan's model, is intended to remedy a capital shortfall that is traceable, in part, to asset write-downs and bond defaults) and a $4.7 million infusion in the first quarter of 1991 (again to remedy a capital deficiency caused by bond defaults).

million was the initial capitalization, of which $2.6 million represented subordinated debt), the record makes clear that both the organizers of the enterprise (John Castle and Leonard Harlan) and the government regulators understood that the bank was a venture whose capital needs might exceed this initial contribution. And just as the business plan anticipated the raising of additional funds in principle, Western Empire set out to raise those funds in practice by hiring an expert to place additional subordinated debt.[13] Given this evidence, we think it fair to say that the funding assumptions contained in the models is descriptive of a course of action that is consistent with the intentions embodied in the contract. It is appropriate, therefore, to conclude that that funding assumption is not an improper link in the chain of events identifying FIRREA as the proximate cause of plaintiffs' damages.

We turn then to defendant's second argument against causation. Defendant contends that, even if the models' funding assumptions do not preclude us as a matter of law from considering FIRREA as the proximate cause of plaintiffs' damages, nevertheless, as a matter of fact, we would be obliged to come to that conclusion. Specifically, defendant maintains that, as of January 1990 (the date the models begin), the bank was a "shop operating at the margin"—an institution in such financial turmoil as to render additional investment in it inconceivable and to cause regulatory authorities to initiate supervisory actions against it. FIRREA, in other words, would have had no effect on the bank because its closure would have occurred even in the absence of a breach.

Two assumptions lie at the heart of defendant's factual causation argument. First, defendant contends that the capital infusion envisioned by Dr. Kaplan and Dr. Losey's models would not have been forthcoming—thereby resulting in the bank's seizure for capital non-compliance. Second, defendant argues that, even in the event of a capital

infusion, the bank's questionable business practices would have led to its demise (in part because safety and soundness concerns would have forced its seizure). We discuss those arguments in turn.

In defendant's estimation, the fact that Western Empire would have required a capital infusion merely to survive—the result of a shortfall concededly unrelated to FIRREA—is prima facie evidence that the bank would not have remained in operation even in the absence of the breach. Defendant correctly states—and plaintiffs concede—that without a capital infusion in January 1990, Western Empire would have fallen out of capital compliance and been subject to seizure. Dr. Kaplan remedies this problem by assuming a $10 million, investor-provided capital contribution in the first quarter of 1990; Dr. Losey addresses it with a $5 million infusion during the same period. Defendant, with a few minor exceptions discussed below, does not dispute that the proposed infusion would have returned Western Empire to capital compliance. Rather, it argues that, in reality, Western Empire would not have been able to raise the funds on which the models rely. A key component of plaintiffs' damages models, then, turns on the court's willingness to accept the premise that plaintiffs would have invested an additional $10 million to keep Western Empire afloat.

Defendant challenges that assumption on the grounds that, given the bank's failure to achieve its stated performance goals, and in light of a less-than-hospitable regulatory climate, an additional infusion made no business sense. Defendant additionally maintains that the entire exercise of assuming an infusion is tainted by hindsight, since the investors could not contemporaneously have known the amount of capital that would ultimately have been necessary to avoid seizure. Finally, defendant contends that, despite the investors' testimony that they would have made a second capital infusion, no evidence

---

13. The effort to raise additional capital through a supplementary subordinated debt offering was abandoned in mid–1989, after only a brief effort, because of a combination of factors that rendered the high-yield bond market temporarily unattractive. These factors included the market's preoccupation with a then-occurring multi-billion dollar leveraged buyout as well as emerging concerns about the prospects of adverse banking legislation—a reference to what later was enacted as FIRREA.

exists to support the assertion that they would in fact have invested additional sums.

Defendant's arguments, though well-taken, are ultimately unpersuasive. While there would obviously have been a point at which the investors would have abandoned this business as unprofitable, several factors lead us to the conclusion that that point had not yet been reached. Fifteen of the original investors testified convincingly that they were both willing, and in a position, to pledge the funds required. The majority of those investors had longstanding relationships with John Castle—the driving force behind Western Empire's acquisition—and many testified that his endorsement alone was sufficient recommendation to warrant an additional investment. Not insignificantly, John Castle himself is a man who, by all accounts, stands by his investments, even in those instances where the bottom line alone can not justify his continued involvement. Mr. Castle testified convincingly that he had intended to see his investment in Western Empire through, a statement bolstered not only by his personal history, but by his discussions with the investors in the wake of FIRREA. We have no reason to question either that Mr. Castle would have sought the $10 million capital infusion required or that the investors would have contributed the amount he requested.

Nor is it lost on the court that the takeover and turn-around of weak or undercapitalized businesses was Castle Harlan's specialty. Indeed it would be difficult to imagine, even in light of the fact that the results from the bank's first year of operations were less favorable than projected, that an organization devoted to the turn-around of underperforming businesses would, in less than a year's time, essentially abandon its undertaking. The losses to which defendant points as evidence of the bank's demise—an alleged year-end operating loss for 1989 of $7.1 million rather than the reported $1.9 million—are questionable both in their accounting legitimacy and in their relevance to the bank's financial prognosis.[14] But even were we to accept defendant's numbers, the losses more reflect the resolution of problems inherited from the old bank than any indictment of the strategies pursued by the bank in its new form.

Indeed, at the heart of our conviction that an infusion would have been forthcoming is that the fundamentals of the original business plan had not changed. The strategy of using federally insured deposits as a low-cost source of funds to buy high-yield bonds and capitalize on the spread was no less appealing in 1990 than it had been at the time of the original investment. Many of the investors in fact testified that, despite the decline in the bond market in the early 1990s, their original approach was unaffected by the market changes. The fact that bond prices were depressed during that period, only made the investment more attractive in the investors' view.

And while it may indeed have been difficult for John Castle to have made repeated phone calls to investors as each new capital shortfall became apparent, we are confident that through a combination of debt placement and strategic equity raising (requesting a greater amount than necessary at a single time rather than several smaller contributions, for instance), Western Empire could have present-

14. Of the $5.2 million in losses defendant believes should have been reported in the 1989 year-end financial statements, $2.5 million represents an additional set-aside of general valuation allowances (GVAs), $1.1 million represents the loss on a defaulting bond, and $1.6 million represents the 50% write-down of a bad real estate loan. Without going into those subjects at length, we note only that defendant's adjustments to the bank's balance sheet and income statements, *even if accepted, do little to change the* financial complexion of the institution. In the case of the bond, the dispute is merely one of timing: whether, as an accounting matter, Western Empire should have recognized the loss in December, before the bond's actual default, rather than in January *as plaintiffs' models assume.* We are at a loss to see how either alternative significantly changes Western Empire's financial prognosis. Similarly, increases in GVAs, while carried on the books as a "loss" for accounting purposes, are merely set-asides of funds in the event of future defaults, and do not, by contract, get subtracted from capital in calculating capital compliance. Finally, the incomplete write-down of the Queen's Bay real estate loan was a matter of much dispute, but, given the efforts of management to work-down the bad real estate inherited from "old" Western Empire, would hardly have come as a surprise to investors or, we believe, affected their decision to reinvest.

ed a financing plan that would indeed have been attractive to investors.

Ultimately, then, we believe that a capital infusion provided by the original investors represents the best and likeliest solution to the shortfall Western Empire faced. Accordingly, we have no difficulty accepting it as a key factor in plaintiffs' models.

Yet, even if many of Western Empire's immediate problems would have been remedied with a capital infusion, defendant nonetheless maintains that the bank's risky or failed business practices would still have ensured its demise. Under this theory, FIRREA was not the actual cause of Western Empire's failure because safety and soundness concerns would have forced the regulators to seize the bank even in light of a capital infusion. In support of this assertion, defendant notes that in its first twelve months of operation, the bank, instead of operating profitably as had been anticipated, actually lost money, as residential mortgage loan originations fell far short of projections and more than half of the properties acquired through loan defaults remained unsold. In addition, defendant points out, the bank had begun to face liquidity concerns as it was forced to fund its high-yield bond portfolio chiefly with short-term brokered deposits (deposits that, characteristically, are more volatile), rather than through a planned collateralized bond undertaking and longer-term certificates of deposit.

In addition to these operational concerns, defendant contends that the bank did not adhere to proper accounting procedures. In defendant's view, the bank overvalued assets, underfunded required reserve accounts, and incorrectly amortized goodwill. According to defendant, the net result of these departures from accepted accounting standards was an institution whose income, as well as its capital, had been grossly overstated. Moreover, because of this overstatement of capital—which, in effect, amounted to an overstatement in growth capacity—the bank was correspondingly able to increase its holdings of high-yield bonds to a level that, had the capital been correctly calculated, would not have been permitted. In short, defendant portrays the bank as an institution short on capital and long on risk. Defendant argues, therefore, that in the heightened oversight of banking institutions that characterized the post-FIRREA world, safety and soundness concerns would have led regulatory authorities to seize the bank and close-down operations.

The various concerns defendant has raised here are both serious and, for the most part, factually correct. We do not believe, however, that those concerns lead to the conclusion that regulators would have forced the bank to close it doors. As an initial matter, the shortfall in performance results that defendant has cited does not, of itself, present safety or soundness concerns. At most, those results bear witness to a business environment that presented challenges to Messrs. Castle and Harlan more demanding than their business plan had envisioned.

By no means could the bank's one year of operation under plaintiffs' stewardship be used as a gauge against which to assess the safety and soundness of the institution. This was, after all, a "turn-around" situation in which a new business format (the linkage of traditional mortgage lending with investments in high-yield bonds and mortgage-backed securities) was being used to rescue a financial institution whose past mistakes (over-reliance on commercial real-estate loans that subsequently defaulted) presented a formidable drag on the "new" bank's earnings. Given the magnitude of the portfolio "work-down" confronting the bank at the start (disposing of roughly $11 million dollars worth of bank-owned real estate arising out of loan defaults), it is hardly surprising that the progress towards profits was slow.

As to the accounting issues that defendant raises, it is difficult to see how those issues could retain any validity, i.e., present safety and soundness concerns, given a capital infusion of $10 million. An infusion of that amount would be more than sufficient to restore the bank to a position of capital adequacy. And that would be true even if the asset valuations that defendant challenges were resolved largely in its favor.[15]

15. Of the several asset valuations that defendant has challenged, two, in particular were the sub-

Thus, while safety and soundness issues could perhaps arise again in the later years of the bank's operation, it certainly cannot be said that such issues would have supported a seizure of the bank in early 1990.

We thus find no reason, grounded either in law or in fact, to conclude that the bank's damages resulted from anything other than the government's breach. Accordingly, we find that plaintiffs' burden in establishing causation has been met.

### ii. Foreseeability

■ We turn then to the second component of plaintiffs' proof of damages: the requirement of foreseeability. Under that doctrine, a plaintiff is entitled to recover only those damages that the party in breach had reason to foresee as the probable result of a breach at the time the contract was entered into. Restatement § 351(1). Plaintiffs, defendant maintains, have failed to satisfy this burden.

In defendant's view, the lost profits that plaintiffs are claiming were not foreseeable because "the purpose of the alleged contract was to recapitalize [the bank] to return it to a safe and sound condition." In that context, defendant notes that "[p]rojected profits were significant only to the extent they may impact on [the bank's] safety and soundness." Profits, defendant argues, "were neither assured under the alleged contract" nor reflective of "the shared understanding of the parties."

■ Defendant's position, however, misinterprets the applicable law. The requirement of foreseeability may be satisfied either by showing that the loss claimed follows from the breach "in the ordinary course of events" or "as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know" when he made the contract. Restatement § 351(2). Virtually all of the evi-

dence presented at trial confirms that the government should have known—and in fact did know—about the profit expectations that led plaintiffs to agree to the contract. Indeed, the government cannot credibly maintain that the potential for profit, without which plaintiffs would have had no incentive to complete the deal, was not within its contemplation. The record makes clear that plaintiffs were forthright in communicating their profit expectations, and the regulators clearly understood the character of plaintiffs' undertaking, a fact evident from the various risk limitations they included in the contract (the asset percentage limitations on high-yield bonds, the risk-weighted capital requirements for different asset classes, and the two-percent tangible capital requirement). The effort to manage risk in this specific manner permits only one conclusion: the regulators understood plaintiffs' goals and recognized the unique risk characteristics of the investments plaintiffs intended to pursue.

Nor is it sufficient to argue, as defendant does in its post-trial briefs, that the object of the contract, from the regulators' standpoint, was merely to restore the bank to safety and soundness without regard to profits. That objective necessarily contemplates the restoration of the bank to a level of profitability. The two go hand-in-hand. Had either party anticipated failure, the transaction would have served neither's needs.

It would follow, therefore, that in being deprived of the opportunity to proceed with the contract, plaintiffs were deprived of any profits that reasonably might be associated with such an undertaking. Those are the profits which plaintiffs seek here. Those too are the profits which defendant understood were the object of the bargain from plaintiffs' standpoint. Foreseeability has thus been established.

---

ject of much debate during the trial—the $2.49 million valuation the bank assigned to its "Furniture, Fixtures and Equipment" and the $5.45 million dollar valuation it assigned to its "Building Premises." Based on extensive testimony regarding the correct valuation for these assets, both from accounting and appraisal experts, the court has concluded that the bank overvalued its

furniture, fixture and equipment by $1 million dollars and its building premises by $.5 million. Reflecting these restated values on the bank's books of account would, *inter alia*, reduce its tangible assets (*i.e.*, capital) by $1.5 million—a reduction that would, in turn, be remedied by an augmentation of capital derived from the capital infusion.

### iii. Reasonable Certainty

██ We come then to the third and final element in the proof of lost profits: the requirement of reasonable certainty. Even those damages that are proximately caused by a breach and are the foreseeable result of it remain unrecoverable if they are, in the words of the Restatement, "beyond an amount that the evidence permits to be established with reasonable certainty." Restatement § 352. Courts have interpreted that requirement as calling for reasonable certainty with regard to the *fact* of damages rather than the *amount,* and have accordingly imposed a lesser standard of proof in the calculation of damages whose existence has been sufficiently established. *See Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

In *Chain Belt,* 115 F.Supp. at 714, the Court of Claims adopted that principle, noting that "if the fact of damage ... is certain, uncertainty as to the precise amount lost is not necessarily fatal to recovery." *See also Petrovich v. United States,* 190 Ct.Cl. 760, 421 F.2d 1364, 1367 (1970); *Neely v. United States,* 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961). We thus begin our assessment of plaintiffs' proof with an inquiry into whether plaintiffs have established the existence of damages with reasonable certainty.

██ We note, as an initial matter, that the claim for lost profits is, at bottom, a prediction about the success the bank could have expected to achieve had it been permitted to proceed with performance under its contract. In order for such a claim to satisfy the reasonable certainty standard, the proof relied upon must be rooted in fact. The court, in other words, must be able to look either to the actual performance of the bank or to the experiences of the industry of which it is a part, to ensure that the profits being claimed are consistent with the projected extension of the bank's economic activity. A claim whose basic structural components lack such factual foundation is simply speculation.

The lost profits models that plaintiffs' experts presented to the court offer an in-depth picture of how the bank was expected to conduct its affairs over the period of the 1990s. Each of the models presents its data in the form of yearly balance sheets and income statements together with all subordinate accounts. The information given is extensive. Taken at their most elemental level, however, the models portray a business venture whose overall profitability depended on three fundamental factors: the way it funded its assets, the return it received on those assets, and its success in reducing or eliminating its embedded costs.

As to the first of these three structural factors—the bank's anticipated funding sources—we have little reason to question the reasonableness of the assumptions contained in the models. Both experts assumed that the bank would draw its lendable funds from essentially three sources: retail deposits (*i.e.,* passbook accounts and short-term certificates of deposit); brokered deposits (*i.e.,* short-term deposits traceable to funds maintained in brokerage accounts); and nondepository borrowings (*i.e.,* borrowings from the Federal Home Loan Bank in San Francisco (Dr. Kaplan's assumption) or short-term collateralized borrowings known more generally as reverse repurchase agreements (Dr. Losey's assumption)).

Our endorsement of these funding sources as transactions reasonably likely to have occurred (had the bank been permitted to proceed with its contract in the post-FIRREA world) is grounded in the fact that these borrowing sources correspond, in the main, to the manner of operation that characterized the bank's activities during the twelve months of its actual existence.

The exception is Dr. Kaplan's partial reliance on borrowings from the Federal Home Loan Bank in San Francisco. In mid–1989, the bank had attempted to gain access to a line of credit at the Federal Home Loan Bank, but was rebuffed in this effort because of a number of deficiencies, including a weak earnings performance, a high level of problem assets, a low level of capital, and an unproven operating strategy. Dr. Kaplan's assumption was that with the reduction in the bank's problem assets that had occurred over the remainder of 1989, and with the significant enhancement in the bank's capital

structure that would result from the model's assumed infusion of $10 million, the bank would be able to establish its credit-worthiness with the Federal Home Loan Bank. We think this assumption has behind it sufficient factual substance to warrant its acceptance here as an event that would be reasonably certain to have occurred. In sum, then, the court accepts the legitimacy of the funding assumptions depicted in the experts' models.

The second structural component of the experts' models that meets the test of reasonable certainty is the rate of return that the models assign to the bank's principal earning assets—the high-yield bonds, mortgage-backed securities, and residential mortgages. In each of these areas of investment, the rates of return the models adopt are the actual rates of return that were realized in the marketplace (during the years depicted in the models) on assets of the same kind and character as those held by the bank.[16] In constructing a hypothetical bond portfolio, for example, the experts incorporated the actual purchases that Western Empire's former investment manager made for a fund whose stated investment strategy and whose previous bond purchases closely matched Western Empire's. That approach, we concluded, evidenced the highest degree of reliability.

Similarly, with regard to the bank's second largest asset category—the adjustable-rate mortgage-backed securities—the rates of return adopted in the models are taken from published data reporting the yield of mortgage-backed securities issued by the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation. In addition, the rates of return shown in the models correspond closely to the yield that was actually realized by the bank in 1989 on its adjustable-rate mortgage-backed securities portfolio.

Finally, as to the bank's retail mortgage portfolio (including both fixed-rate and adjustable-rate mortgages), the yields shown in the models were based on the prevailing Federal Home Loan Mortgage Corporation rates (for the fixed-rate mortgages) and on the cost-of-funds index and one-year Treasury rates (for the monthly and annually adjustable-rate mortgages) as reported in official publications. The models assume that the portfolio mix between adjustable and fixed-rate mortgages would correspond to market breakdowns.

Dr. Kaplan's model additionally assumes that the bank would be able to grow its mortgage banking business to approximately $20 million worth of mortgage originations per month by the end of 1991 (from approximately $8.5 million monthly experienced during 1989) and, in subsequent years, to sustain a mortgage origination rate roughly equal to one quarter of one percent of the state-wide annual originations volume. Defendant criticizes these numbers, particularly the above-industry growth rates attributable to 1990 and 1991. We think these projections in growth are legitimate, however, given that they are, in fact, simply a scale-back of numbers that were actually achieved during the years in question by a mortgage banking business operated by the same complement

---

16. During the pretrial phase of this lawsuit, defendant took issue with plaintiffs' intended reliance on post-breach data to establish the rates of return the bank would have received on its earning assets in the post-FIRREA world. Defendant contended that the use of post-breach evidence to fix the amount of damages was legally impermissible. The rule in this circuit, defendant maintained, requires damages to be determined as of the time of breach.

The court rejected this argument. Defendant was correct, we concluded, in saying that damages are to be determined as of the date of breach. *See, e.g., Reynolds v. United States*, 141 Ct.Cl. 211, 158 F.Supp. 719, 725 (1958). In the application of this rule, however, courts can—and indeed, should—consider post-breach evidence if, by doing so, they can more accurately measure the value of the contract expectancy in place at the time the breach occurred. In other words, damages should reflect what would have been gained (or lost) had performance been allowed to proceed. The Restatement's illustrations confirm this point. *See, e.g.,* Restatement § 352 cmt. b, illus. 6, § 344 cmt. b, illus. 5. The aim is to compensate an injured party for the loss actually sustained, *i.e.,* to "put him in as good a position as he would have been in had the contract been performed," to the extent it is possible to do so. *Id.* § 347 cmt. a. Unquestionably, prior decisions in this court have looked to post-breach evidence when considering lost profits claims. *See, e.g., Chain Belt*, 115 F.Supp. at 718; *Neely*, 285 F.2d at 443.

of personnel that the bank would have employed had it remained in business.[17]

Taken as a whole, the models' assumptions that the bank's total investment portfolio would have yielded positive returns is well supported. Given this conclusion, and given also the conclusion previously reached—that plaintiffs have established with reasonable certainty the bank's access to reliable funding sources for its expected investments—we come then to the decisive issue in the case: whether the expenses identified in the models as the bank's expected costs of operation have been established with sufficient certainty to support the conclusion that, over time, the bank would have become a highly profitable venture. It is this issue that occupied so much of the parties' time at trial. After much deliberation, we conclude that, in this aspect of their composition, the models' assumptions do not rise to the level of reasonable certainty.

Two matters in particular are of concern: the models' assumptions regarding the bank's commercial real estate portfolio and the assumptions made in respect to the bank's interest-rate hedging strategy. We discuss these in turn.

In the only year of its operation, 1989, the bank's revenues and net income were seriously affected by the troubled real estate loans and foreclosed-upon properties that remained from its earlier years' venture into commercial real estate lending. Of the $31.7 million dollars in commercial real estate loans that were on the bank's books at the start of 1989, nearly one-half ($14.8 million) had been classified as "substandard," *i.e.*, loans whose expected repayment in full was now questionable because of a subsequent impairment in the borrower's paying capacity and/or a deterioration in the adequacy of the underlying collateral. Substandard loans hold out the distinct risk that the lending bank will suffer some loss.

In addition to the substandard loans, the bank was also carrying a portfolio of foreclosed-upon commercial real estate properties

(referred to as "real estate owned" or "REO") amounting to $11.4 million. Real estate owned generally signifies property that has lost value relative to the underlying loan amount and consequently implies a loss to the bank. Additionally, real estate owned represents non-interest earning assets that further burden a bank with the expenses of property ownership including taxes, insurance, utilities, and maintenance.

By the end of 1989, this drag on earnings had been only partially alleviated: substandard loans had been reduced to $8.4 million (presumably through refinancing arrangements) and real estate owned had been reduced to $6.1 million (through sale of the properties involved).

It is these year-end numbers—$8.4 million of substandard loans and $6.1 million of REO—that are carried over to the experts' models. In the incorporation of these values into the bank's projected operations, three assumptions are made. First, the models assume that the bank would be able to dispose of these underperforming assets over a two-year period; second, that the assets would be sold at their net book value without the need for further increases in the bank's loan-loss reserves beyond amounts established at the end of 1989; and, third, that the remainder of the bank's commercial real estate loan portfolio (amounting to approximately $13 million as of January 1990) would experience no further deterioration in performance-quality. At base, then, the models presume that the credit quality of the bank's commercial real estate loan portfolio and the booked value of its REO would remain unchanged over the years 1990 and 1991.

This is not an assumption we can accept. The evidence reveals that the years 1990 and 1991 witnessed a significant downturn in the general economy, with the commercial real estate markets in Arizona and California (the situs of the bank's commercial real estate loans) being particularly hard hit. Under these circumstances, one cannot say with any degree of certainty that the bank would es-

17. As indicated, the growth in the bank's mortgage banking business that is set forth in the opinion pertains to Dr. Kaplan's model only. Dr. Losey's model relies on slightly different as-

sumptions but reaches a result that does not sufficiently differ from Dr. Kaplan's model to warrant separate discussion.

cape the necessity for further write-downs either in its commercial real estate loan portfolio or in the properties it acquired through foreclosure.

Dr. Kaplan answered this concern by pointing out that the bank had undergone a rigorous "safety and soundness" examination in the fall of 1989 and hence, in his view, its commercial real estate loans could be expected to withstand the strains of a declining economy without further downward adjustments in value. Although this argument is not unreasonable in its own right, we are compelled to note that over this same period of time (1990–1991), the experts' models assume an absence of growth in the bank's balance sheet for a variety of reasons, including, as Dr. Kaplan notes in his report, "weakening conditions in the Arizona and California real estate markets." In the face of this observation—one which other evidence in the record fully supports—the court cannot accept, as reasonably certain, Dr. Kaplan's assumption that the reevaluation and reclassification of the bank's commercial real estate loan portfolio that occurred as part of the FDIC's 1989 bank examination would have been sufficient to eliminate the need for future write-downs in that portfolio. And such write-downs, were they to occur, would, of course, have diminished the bank's assets and, correspondingly, would have given rise to a need for additional capital beyond the $10 million infusion that the models have assumed.[18]

The need for an additional capital infusion is a point whose significance we return to later. For the moment, however, we move on to discuss the other component of the bank's various projected expenses that is of particular concern to the court, namely, the change in the bank's interest rate hedging strategy that was incorporated into the experts' models.

First, some explanation. Savings and loan institutions (or "thrifts") are fiscal intermediaries—institutions that borrow funds from one source, the thrift's depositors, and lend them to another source, the thrift's borrowers. The expectation is that the difference between the cost of funds (*i.e.*, the interest rate paid to the depositors) and the rates of return realized upon the lending of those funds, will be sufficient, after allowance for all costs of operation, to yield a profit. In the management of this business, a particular difficulty that thrifts confront (along with other large lending institutions) is that the earning assets (*i.e.*, loans to borrowers and other investments) typically mature at a later date than the liabilities that are used to fund them (*i.e.*, deposits). Because of this timing difference, thrifts run the risk that as their deposits mature, the cost of replacing them with other deposits may have increased due to an intervening increase in interest rates. In such a situation, the thrift would experience a decline in earned income because of the narrowing of the spread between the interest being earned on assets and the interest being paid on liabilities. Indeed, in extreme cases, the spread can become negative, thereby eroding the thrift's capital base. This was, in fact, the condition that befell a large segment of the thrift industry in the 1980s.

To guard against these risks, thrifts now employ a variety of interest rate hedging strategies, two of which are of importance to this case: swaps and Euro-dollar CD put options. (CD refers to "certificate of deposit.") In a swap contract, the bank agrees to pay a counter-party a fixed rate of interest each month—say 9% on a notional amount of

---

**18.** Although the views expressed in our opinion are specifically directed to Dr. Kaplan's model, similar criticisms would also apply to Dr. Losey's model. Whereas Dr. Kaplan's model assumes that no further write-downs in commercial real estate values would be required beyond those noted in the bank examination conducted in the fall of 1989, Dr. Losey's model takes essentially the opposite approach. That is to say, Dr. Losey's model disregards the write-downs reported in the bank examination and, instead, assumes, that the bank's commercial real estate portfolio would experience a deterioration in value roughly equal to the deterioration recorded by those thrift institutions that survived the California real estate decline. As defendant's expert pointed out, however, such an approach not only disregards the fact that the loans had already been identified as troubled loans, but compounds that error by using as a yardstick numbers that are inherently biased because they exclude the results (*i.e.*, the losses) of institutions that did not survive the downturn in the California economy.

$180 million—in exchange for an agreed-upon variable rate (one that usually tracks the prevailing short-term interest rate). Thus, if the short-term rate—and hence the rate the bank must pay to attract deposits—goes above the fixed rate of 9%, the bank receives payments from its counter-party that it can in turn use to pay its depositors. If the short-term rate falls below the fixed rate of 9%, the bank is able to pay less than 9% to attract deposits, but is obligated to pay the difference between the 9% and the short-term rate to its counter-party. Under either scenario, then, the bank's cost of funds remains at 9%. In this manner, the bank trades away the risks associated with the variability of the short-term interest rate in favor of the certainty of a fixed-payment obligation.

With a put option, by contrast, the bank avoids the burden of a fixed-rate payment but assumes the short-term risk. That is the case because a put option allows its purchaser to exercise the option—*i.e.,* issue a certificate of deposit at a pre-agreed interest rate at a pre-set time—only when doing so would be to the financial advantage of the purchaser. Put differently, an option holder whose contract allows it to issue a CD at 9% in three-month's time, would choose to exercise that option only if, at the three-month mark, prevailing interest rates exceeded 9%. (The bank would thus be able to issue CDs, *i.e.,* obtain deposits, for lower than the rate it would be forced to pay on the open market.) If instead the interest rates were lower than 9% at the three-month mark, the option holder would simply decline to exercise its option. Put options thus allow a bank to place a cap on its cost of funds, while at the same time (and in contrast to swap contracts) taking advantage of declines in interest rates. As interest rates rise, however, the price of put options rise as well (in contrast to swap contracts, which have no initial cost).

Returning now to the facts, in the early months of its operation under Castle Harlan's management, the bank began a rapid build-up of its high-yield bond portfolio, funded primarily with brokered deposits. At the same time, it turned to interest rate swaps as the principal hedging mechanism through which to protect itself against the interest-rate risk exposure inherent in shorter-term liabilities. Thus, by the end of 1989, the bank had become a counterparty to some 18 separate swap agreements under the terms of which it was obligated, as the fixed-rate payor, to pay an average interest rate of 9.63 percent on a total notional amount of approximately $180 million.

In the main, the swaps worked well for the bank. In the first five months of their use in 1989 (April through August), the exchange of interest rates favored the bank, *i.e.,* the variable rate exceeded the fixed rate, and the bank therefore earned interest income (from the swaps) in each of these months. Over this five-month period, the bank recorded approximately $142,000 in swap-derived income. In the final four months of the year, however, short-term rates began to fall below the bank's fixed-rate obligation; hence reversing the direction of the pay-out owing under the swap contracts. The bank now became the paying party. Over the final four months of the year, the swap contracts cost the bank approximately $262,000.

It is this change in the relationship between long and short-term interest rates that the bank experienced in the final four months of 1989—the return to what is called the normal yield curve—that takes us now to the experts' models and to the change in hedging strategies that those models have assumed: the abandonment of swaps in favor of Euro-dollar CD put options.[19]

No single assumption included in the experts' models is more central to the ultimate profitability of the bank than the bank's change in hedging strategies from interest rate swaps to Euro-dollar CD put options. Had the bank remained a counterparty to the swaps, it would have required a much larger capital infusion than the $10 million the models assume. To quote Dr. Losey, the expert to whom the change in hedging strategies is

---

**19.** Euro-dollar certificates of deposit are dollar deposit claims upon U.S. banks deposited in banks outside of the United States.

attributable: [20] "It's possible that if they had stayed in the [swap] hedge entirely, it's possible that the infusion needed would have been 15, 18, 20 [million dollars]—I'm not sure how much money but substantially more." Plainly put, without the assumed change in hedging strategies, the bank would not have survived.

The troubling point about the proposed change in hedging strategies is that at the time the bank is assumed to make this move—sometime in the first quarter of 1990—the bank's investment committee could not have foreseen the direction in which interest rates would move; hence, they could not have foreseen the magnitude of the payout (the interest rate differential) that the swap contracts would ultimately have required. Given this fact, the question that must be answered is this: Is the change in interest rate hedging strategies that the models propose legitimately justified on the basis of economic fundamentals in place in the first quarter of 1990, or is that change simply the inspiration of hindsight?

Put options, we should say at the outset, are not inherently lower in cost than swaps, nor do they offer a more efficient interest rate risk-management tool. Rather, swaps and put options are essentially different approaches to the same problem. In a swap, the bank, as the fixed-rate payer, trades away the risks associated with the variability of the short-term interest rate in favor of the certainty of a fixed payment; in a put option, on the other hand, the bank avoids the burden of a fixed-rate payment but assumes the short-term risk. Because of this difference in focus, swaps, on average, are more efficient, *i.e.*, provide better protection at lower cost, than puts in a rising interest rate environment and, conversely, are less efficient than puts in a declining interest rate environment.

With these thoughts in mind, we come to the reasoning that was offered in support of the assumption that the bank would buy out its swap commitments in favor of relying on put options as its primary hedging mechanism. Two principal reasons are given in support of the change—the first offered by Dr. Losey; the second by Robert Wages, a Castle Harlan employee responsible for much of the preliminary analyses leading up to the acquisition of the bank. Although Dr. Losey gave a number of reasons to justify the change in hedging strategies, his core thought was this: that the deterioration in the bank's net worth that had occurred during 1989, coupled with the downward trend in interest rates that seemed to have taken hold, would have prompted the bank to reexamine the wisdom of remaining in swaps. The bank, Dr. Losey contended, would have come to see that swaps commanded too large a share of the bank's income and therefore significantly diminished the likelihood of its achieving profitability. Dr. Losey's view is best set forth in his answer to the question of how he thought John Castle might respond to the situation the bank found itself in at the start of 1990: "I think when he saw what had happened to the market and saw that the profits of the institution had declined significantly and that their market value of net worth had declined significantly, that logically at least, he would have been aware that the put options gave the institution a significantly better chance of turning around, of improving its situation."

An alternate rationale for the assumed change in hedging strategies was provided by Robert Wages. In his view, the bank's decision-making process would have been guided by the same considerations that Castle Harlan took into account when examining hedging strategies in respect to the investment funds Castle Harlan itself managed. That decision, he explained, is guided by the spread between long and short-term interest rates. Specifically, when long-term rates exceed short-term rates—a situation referred to as the "normal yield curve"—the preference is to avoid a fixed-rate payment obligation; hence, put options become the strategy of choice. Conversely, when short-term rates equal or exceed long-term rates—a sit-

**20.** Although the change in hedging strategies from swaps to put options occurs in each of the expert's models, the expertise associated with this idea rests exclusively with Dr. Losey. While Dr. Kaplan incorporated the same concept into his model, he acknowledged that his understanding of Euro-dollar CD put options was limited to only a general familiarity with the subject.

uation referred to as a "flat" or "inverted yield curve"—there is more of an incentive to pay, rather than to receive, a fixed rate; hence, swaps are favored. Mr. Wages summed up his views this way: "It only makes sense to move away from swaps when you have an upward sloping yield curve and the difference in the short rate and the long rate is wide enough that over the course of a year or some period of visibility you might want to look at, if rates stay where they are, that you're going to get a payback on the premium you pay up front for the option. . . . [M]y experience is that you normally need to have at least 100 basis point difference between short rates and long rates before it makes sense to look at getting out of the swap."

On the face of it, the views expressed by Dr. Losey and Mr. Wages would seem to offer imminently reasonable grounds for pursuing a change in hedging strategies. But this court's task is not to judge whether a given proposition is reasonable in its own right. It is, rather, to decide whether that proposition, when offered as a prediction of a likely future occurrence, has enough experience behind it to permit a court to say that the predicted event is one reasonably certain to occur. And that level of proof, as we said earlier, is achievable only through external verification. We must be able to find confirmation of the proposition at stake either in the history of the undertaking or in the nature of the subject at issue. We do not encounter that level of assurance here.

Not surprisingly, there is nothing in the bank's brief operating history that would help support the assumed change in hedging strategies. Swaps, rather than put options, served as the bank's primary hedging device throughout 1989. Nor do we find much guidance in the risk management policies and procedures that the bank had adopted. Granted, these in-house guidelines do acknowledge that "[i]nterest rate swap agreements will be offset or sold if the desired hedging goals can be met in a cheaper or more efficient manner by utilizing another hedging strategy." However, the probative value of this statement is tempered by the fact—as further noted in the same in-house

guidelines—that the bank's general requirement is for a hedging strategy that will produce gains as rates increase and that such hedges "[u]sually . . . will produce losses as rates decrease." Based on this statement, we can rightfully say that the bank was aware from the start of the downside risks associated with the use of swaps but elected to rely upon them nevertheless.

The absence from the bank's operating history of any changes in hedging strategy of the sort now being contemplated, while disadvantageous to plaintiffs' position from a burden of proof standpoint, is certainly not fatal. Even in the absence of confirmatory past conduct, plaintiffs could still prevail in their position—*i.e.*, establish the proposed change in interest rate hedging strategies to a degree of reasonable certainty—if the economic fundamentals in place in the first quarter of 1990 (the time the change is assumed to occur) convincingly demonstrate the wisdom of such a move.

Both Dr. Losey and Mr. Wages did, in fact, focus on such fundamentals. To recall, Dr. Losey saw the change to put options as a means of arresting the dollar outflow that the swap agreements were imposing on the bank in late 1989, and which, if not abated, would have driven the bank into insolvency. Essentially the same thought was expressed by Mr. Wages. His view was that a change in hedging strategies would be warranted when the interest rate yield curve returned to its normal configuration—when long-term rates became higher than short-term rates—and the spread between the two rates reached roughly 100 basis points, *i.e.*, one percent. (In this environment, each 100–basis point spread between long and short-term rates would impose a $1.8 million outflow on the bank if it remained with the swaps up to the full notional amount of $180 million.)

No doubt, these arguments have substance. But they do not go far enough. The problem each presents is this: the change in hedging strategies—from swaps to put options—was not an expense-free undertaking. Were that change-over to have been carried out in the first quarter of 1990, as the experts' models assume, it would have cost the bank $3.1 million dollars—the buy-out cost of

its fixed-payment obligation under the swap contracts. To justify an expense of this magnitude—one which, in essence, amounts to a very large bet in favor of a sustained downward movement in short-term interest rates—the bank would have been obliged, by the terms of its risk management policies and procedures, to have analyzed its interest rate risk and determined, through such analysis, that a change to Euro-dollar CD put options reduced that risk.[21]

No such analysis accompanied the experts' models. Instead, we were told by Dr. Losey that the change in hedging strategies was, in part, justified by the decline in short-term interest rates that was occurring throughout 1989. But that decline, as Dr. Losey himself recognized, was simply part of a longer term trend of falling interest rates that had been ongoing "since Paul Volker jacked interest rates up in 1980–81." In other words, the trend was as much apparent in early 1989, when the bank first entered into its five-year swap agreements, as it was in early 1990, when the relinquishment of swaps in favor of put options is assumed to occur.

And, just as the bank had chosen to rely on swaps as its primary hedging strategy despite a prevailing downward trend in interest rates, so too did it make that choice despite the fact that, over the five-year term of the swap contracts, the bank could reasonably have anticipated the prevalence of a normal yield curve. Hence, the likelihood of incurring a net expense over the life of the swaps would have been an expected outcome. Thus, as the court sees it, the reasons that Dr. Losey and Mr. Wages offered in support of a change in hedging strategies were reasons that the bank could reasonably have been expected to take into account at the time the swap contracts were executed. In short, those reasons make out no case for a change in hedging strategies—at least not

one that this court can now endorse under the criterion of reasonable certainty.

We do not mean to say that the bank would forever remain wedded to its swap contracts. Rather, our point is only that one cannot say with reasonable certainty that the bank would have been so quick to jettison the swap contracts in favor of put options—having experienced only four months of negative interest rate payments, all of which were foreseeable from the inception of those contracts—and, at the same time, incur a $3 million expense as the price of doing so.

Indeed, the testimony itself lends force to our concern about the timing of a change. In Dr. Losey's model, for example, the assumption is that the bank would close-out its swap contracts in January 1990. According to Mr. Wages, however, the more likely exit time would have been in the March–April 1990 period when the spread between long and short-term interest rates first crossed the 100 basis-point threshold. (There was also testimony to the effect that the bank would have been prompted to make at least a partial change to put options in February 1990 because of the bankruptcy of Drexel Burnham Lambert, Inc., a brokerage firm that was the counterparty on approximately one-third of the bank's $180 million in swap contracts.)

We cannot, of course, be certain when the change would have occurred or, for that matter, whether it would have occurred at all. This much, however, is clear: the timing is critical to the sufficiency of the $10 million capital infusion that the experts' models assume. The cost to exit the swaps at any time after the end of the first quarter of 1990 begins to rise dramatically from the low point of $1.8 million (at the end of March) to $8.4 million by year's end. (And, after 1990, with the continuing decline in interest rates, the

---

**21.** Some sense of the magnitude of this bet may be gleaned from the fact that, if short-term interest rates were to rise to 9.63 percent (the strike price assumed in Dr. Losey's model) and remain at that level, then the bank, using at-the-money put options (*i.e.*, options with a strike price of 9.63 percent), would have had to reestablish its hedge every six months at a cost, to start with, of $2.8 million. For each subsequent six-month period, the cost of renewing the put options

would have declined by $279,000 reflecting the shortening maturity of the bank's high-yield bond portfolio.

As a point of reference, we show here the monthly short-term interest rates that prevailed in 1989: January—9.38%; February—10.31%; March—10.31%; April—9.94%; May—9.56%; June—9.31%; July—8.56%; August—9.00%; September—9.19%; October—8.69%; November—8.50%; and December—8.38%.

exit costs become even larger.) The upshot, then, is this: to effect the change in hedging strategy at any time other than during the predicted first quarter of 1990 would have demanded substantially more money from the bank's investors.

The last point brings us now to our final thought on the issue of reasonable certainty. Throughout the course of these proceedings, plaintiffs have urged the court to view the experts' models as depictions of a reasonably probable course of events rather than as forecasts of certainty. In keeping with that approach, we have been asked to recognize that, had the bank been permitted to operate in the post-FIRREA world, the capital infusion it would actually have required might either have been less or, if necessary, more than the $10 million that the models assume. Therefore, the thought continues, to the extent the court is unable to accept some of the models' cost assumptions (as, in fact, is the case with regard to the expenses identified with the commercial real estate portfolio and the change in hedging strategies), we should at the same time recognize that the investors would be willing and able to address any resulting capital shortfall.

The court has, in fact, approached the evaluation of the experts' models with the degree of flexibility that reasonableness would demand of any prediction regarding future events and circumstances. Pinpoint accuracy has not been our expectation. In that spirit, we accept the premise that the investors would not have allowed the bank to fail if the capital infusion actually required had turned out to be, say, $11 million instead of the assumed $10 million.

But that flexibility in approach has its limits. The court cannot simply assume that whatever capital shortfall might occur, the investors would have been willing to make up the difference. At the start of the undertaking, the Castle Harlan group projected a growth in stockholders' equity from $12.0 million to $147.4 million over an eight-year period. This equates to an average annual return of 36.8 percent. However, with the addition of another $10 million to the capital base (the assumed capital infusion), the average annual rate of return is reduced to 26.8 percent. Thus, to have approached the experts' models with that degree of latitude in judgment now being asked of us, the question that needed to be answered—but was not—is how much more the investors would have been willing to put into the venture before reaching their tipping point, i.e., before the market could be seen as offering more attractive investment opportunities elsewhere. The experts never took on this essential question.

In the final analysis, then, even if we could quantify the extent of our disagreement with the experts' cost assumptions, we could not go on to the next step: to say with the confidence that reasonable certainty demands that the investors would have been willing to make up the difference. We end on that note.

### Dr. Losey's Alternative Damages Calculation

■ In addition to his lost profits model, Dr. Losey offered an alternative damages calculation that attempted to establish a value for the contract measured as of the date the contract was signed. Using this *ex ante* approach, Dr. Losey focused on what he considered to be the chief component of value in the bank's contract—its right to the leveraged purchasing of high-yield bonds, using, as a principal source of funds, lower-cost government-insured deposit accounts. ($15 million of capital could support a $263 million bond portfolio.)

In determining the value of this right, Dr. Losey relied on three factors: (i) a projected volume or dollar amount of high-yield bonds that the bank would eventually acquire; (ii) an assumed spread between high-yield bond rates and the bank's cost of funds (adjusted for expected defaults and other related expenses, including the costs associated with the management of interest rate risk, i.e., the cost of hedging strategies); and (iii) a discount factor to determine present values. Using this methodology, Dr. Losey determined that, as of the date of contracting, the year-end 1988 value of the bank's right to acquire and hold high-yield bonds was approximately $31.1 million. This figure, Dr. Losey further explained, would vary only

slightly if measured as of the date of the breach rather than the date of the contract.

■ We cannot accept this approach. Expectancy damages, as the Restatement points out, are "not based on the injured party's hopes when he made the contract but on the actual value that the contract would have had to him had it been performed. . . . It is therefore based on the circumstances at the time for performance and not those at the time of the making of the contract." Restatement § 344 cmt. b. Dr. Losey's *ex ante* approach is fundamentally out of line with this rule and therefore cannot be endorsed.

However, even if contract law could accommodate a damages analysis of the present sort, we would still find its particular application here unacceptable. Both the narrowness of Dr. Losey's focus (the *ex ante* approach addresses only the high-yield bond portfolio without regard to the other components of the bank's business) and the paucity of detail that he builds on, would compel us to reject this approach for lack of substantive reliability. Indeed, the approach is not much more than an outline of damages.

### Restitution Interest

■ We proceed now to the second theory of recovery on which plaintiffs rely: restitution. In contrast to expectation damages which seek to put an injured party in as good a position as he would have been in had the contract been performed, restitution serves as an alternative remedy for breach that attempts to return an injured party to the position he was in before the contract was formed. Restatement § 373 cmt. a. Thus, restitution focuses on disaffirmance of the contract as opposed to its enforcement.

■ The rationale that guides the application of restitution in the contractual setting has been alternately described. The Restatement, for example, relates the protection of a party's restitutionary interest to "the prevention of unjust enrichment." Restatement (Second) of Contracts (Introductory note preceding § 370). Case law, on the other hand, puts its focus on restoration of the parties' status preceding the contract's

execution. *See Acme Process Equip. Co. v. United States,* 171 Ct.Cl. 324, 347 F.2d 509, 530 (1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966) ("[R]estitution is permitted as an alternative remedy for breach of contract in an effort to restore the innocent party to its pre-contract *status quo,* and not to prevent the unjust enrichment of the breaching party."); *Resolution Trust Corp. v. Federal Sav. & Loan Ins. Corp.,* 25 F.3d 1493, 1504 (10th Cir.1994) ("The purpose of . . . restitution is to put the plaintiff in as good a position as it enjoyed before the contract was made by requiring the defendant to restore the value of plaintiff's part performance or reliance."). Irrespective of doctrinal orientation, however, the essential requirement for the recognition of a restitutionary remedy is that a benefit have been conferred: "A party is entitled to restitution . . . only to the extent that he has conferred a benefit on the other party by way of part performance or reliance." Restatement § 370.

Consistent with this requirement, plaintiffs' advance three restitutionary formulas, each centered on a benefit allegedly conferred on the government. The first, which they refer to as the "cost of performance," seeks recovery of the approximately $15.1 million that was used to recapitalize the bank at the outset of the venture. The second, which they caption "the initial benefit conferred," rests on the assumption that the benefit conferred is most appropriately measured by the costs which the government avoided as a result of plaintiffs' take-over of the bank. (In this context, the term "avoided costs" refers to the costs which the government is presumed to have saved by not having to liquidate the bank.) As of the end of 1988, the costs avoided are claimed to be $20.75 million.

The third of the restitutionary formulas plaintiffs would have us consider is one they refer to as "the total benefit conferred." This approach is the sum of three components: plaintiffs' initial capital contribution ($15.1 million less $1.5 million of non-contributory transaction costs); the bank's earnings from date of take-over, January 1989 until February 1990 ($8.24 million per plaintiffs'

calculation); and the investment earnings (*i.e.*, interest) which the government presumably realized from the liquidation costs avoided over the thirteen-month period of plaintiffs' management of the bank ($13.74 million per plaintiffs' estimation). The sum of these numbers comes to roughly $35.6 million. Plaintiffs assert that, in accordance with accepted principles of restitution, they are entitled to an award of the highest of the three amounts identified above.

■ In the court's view, plaintiffs are entitled to restitution in the amount of their original investment—$15,122,360. We come to our conclusion by several steps. First, as already noted, restitution as a contract remedy requires that a benefit have been conferred. In determining whether a benefit has been conferred, we look to the terms of the agreed exchange: "[t]he benefit is ordinarily conferred by performance by the party seeking restitution, and receipt by the other party of performance that he bargained for is regarded as a benefit." Restatement § 370 cmt. a. In this case, what the government bargained for and received was an infusion of capital into an ailing bank and the subsequent operation of that bank in accordance with an approved business plan. The government got what it bargained for; hence, restitution is available.

■ Second, where restitution is to be accomplished through an award of money (as opposed to specific restitution), the value of the benefit conferred may be measured either by its market value—"what it would have cost [the recipient] to obtain it from a person in the claimant's position," Restatement § 371(a)—or by its enrichment value— "the extent to which [the recipient's] property has been increased in value or his other interests advanced." Restatement § 371(b). Under neither of these standards, however, would it be appropriate to measure the value of the benefit conferred by expenditures the recipient may have avoided as a result of the transfer. Such collateral advantages, while they may derive from the benefit conferred, still are not part of it. Fundamentally, restitution is a restorative remedy—one that seeks to return to the giver the reasonable value of what was given. The remedy's focus

is upon the diminution in value of the injured party's estate. Restitution does not permit the injured party to expand the value of the benefit conferred beyond the amount for which that benefit could have been acquired in the market place. *See* Restatement § 371 cmt. b, illus. 2; 5 Corbin, Contracts § 1112 (1964 & Supp.1999).

Finally, in determining the amount of plaintiffs' restitutionary award, it does not matter that, at the time the breach occurred, the bank was worth less than the amount plaintiffs had initially contributed. Nor is it significant that the costs to liquidate the bank in 1990 were greater than those costs would have been had the liquidation been carried out in 1988. Given the limited time plaintiffs had available before the breach in which to prove the merits of their business plan, the bank's subsequent operating history is irrelevant. Plaintiffs are entitled to the value of the benefit they conferred, measured as of the time their performance took place. 1 George E. Palmer, The Law of Restitution § 4.2, at 372 (1978).

In accordance with the foregoing discussion, plaintiffs are entitled to an award in restitution of $15,122,360—the amount they contributed to the capital of the bank.

■ In addition to requiring the return of plaintiffs' $15.1 million capital contribution, the court has also considered the question of whether they may recover interest on that amount. Restitution, properly administered, would certainly favor such a result, for only through the addition of interest can we truly restore plaintiffs to the economic position they were in before the contract was executed.

Despite the appropriateness of allowing interest as part of the award, however, statutory constraints compel us to withhold that additional measure of restitution. The relevant statute, 28 U.S.C. § 2516(a) (1994), states in unequivocal terms that "[i]nterest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof."

We cannot avoid the barrier of the statute by identifying interest as part of the judgment as opposed to interest on the judgment. The prohibition extends to any form of award for the time value of money that has not been authorized by the express terms of the transaction sued on. *United States v. Mescalero Apache Tribe,* 207 Ct.Cl. 369, 518 F.2d 1309, 1315–21 (1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); *Far West Fed. Bank v. OTS,* 119 F.3d 1358, 1366 (9th Cir.1997). Plaintiffs' recovery in restitution cannot, therefore exceed the $15.1 awarded.

### *Fifth Amendment Taking*

Having adjudicated plaintiffs' contract claims, we turn finally to the third of plaintiffs' counts: a claim for the recovery of just compensation under the Fifth Amendment to the United States Constitution. Specifically, and in the alternative to their contract-based claims, plaintiffs contend that the passage of FIRREA effected a taking of both their ownership interest in Western Empire and their contractual agreement with the government.[22] In response, defendant argues that the only rights and remedies available to plaintiffs are those arising from their contract. Thus, in defendant's view, the sole right plaintiffs possess is the right to monetary damages in the event of contractual nonperformance, and the sole remedy open to them is for breach of contract.

■ Plaintiffs are of course correct in their assertion that contracts—including those with the federal government—constitute property rights within the meaning of the Fifth Amendment. *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) ("Rights against the United States arising out of a contract with it are protected by the Fifth Amendment."). Where the government so interferes with an individual's contract rights as to effectuate a taking, it cannot avoid the payment of just compensation. But as this court and its predecessor court have held, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 572 F.2d 786, 818 (1978) (citation omitted).

■ In defendant's view, a plaintiff cannot pursue a takings claim for a government action that interferes with property rights, where those rights were voluntarily created by contract. *Sun Oil, supra,* is cited in support of this proposition. In contrast, plaintiffs interpret *Sun Oil* as standing for the principle that a breach of contract claim is the exclusive remedy when the government has acted solely in its proprietary capacity (as contractor), but that a takings claim may be pursued when the government has exercised its sovereign authority. After a careful consideration of the relevant caselaw, we conclude that neither side's interpretation fully answers the question at hand: whether plaintiffs in fact have a property right that has been taken.

The difficulty with defendant's position is that a litigant may indeed maintain a takings action even where its rights have been created exclusively by contract. *Lynch v. United States*—a case in which the plaintiff was eligible for just compensation when its contractually created right to war risk insurance was abrogated by statute—offers us an example. Similarly, while plaintiffs may be correct that a sovereign act is a prerequisite to invoking the Takings Clause,[23] that obser-

---

**22.** As previously mentioned, plaintiffs have urged us to address their taking claim despite our having ruled on their contract-based claims. Because of the significance of that issue, and in the interest of judicial economy, we have complied. *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 572 F.2d 786, 817–818 (1978); *Chandler v. Hibberd,* 165 Cal.App.2d 39, 332 P.2d 133, 140 (1958).

**23.** To the extent that the case law draws a distinction between proprietary and sovereign acts,

that dichotomy becomes less meaningful in light of the Supreme Court's pronouncement in *Winstar* that "the inescapable conclusion ... is that the Government's 'regulatory' and 'nonregulatory' capacities were fused in the instances under consideration, and we suspect that such fusion will be so common in the modern regulatory state as to leave a criterion of 'regulation' without much use in defining the scope of the sovereign acts doctrine." *Winstar,* 518 U.S. at 894, 116 S.Ct. 2432.

vation does little to answer whether anything has in fact been taken. *Branch v. United States,* 69 F.3d 1571, 1575 (Fed.Cir.1995) ("In analyzing a takings claim, a court must first determine what was taken.").

In the oft-repeated words of *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960), the Fifth Amendment is designed "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." At its core, the Fifth Amendment provides a guarantee that the government will neither contravene the settled expectations that make up the essence of property rights nor dramatically diminish property values without paying just compensation. Whether a taking has occurred therefore depends on the nature and scope of the property right at stake.

In the present case, any rights the plaintiffs possess were conferred on them by contract. But as Justice Scalia's concurring opinion in *Winstar* makes clear, the formation of a contract does not entitle its signatories to absolute performance, but rather gives rise to the expectation either that the contract will be performed or that the non-breaching party will have available to it a contract-based remedy. "Virtually *every* contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance. The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it, and nothing else." *Winstar,* 518 U.S. at 919, 116 S.Ct. 2432 (Scalia, J., concurring) (citing Holmes, The Path of the Law (1897), in 3 The Collected Works of Justice Holmes 391, 394 (S. Novick ed.1995)).

The savings & loan plaintiffs, the *Winstar* Court concluded, have no absolute right to the regulatory treatment specified in their contracts, but only a right to be compensated should that regulatory treatment be altered. The government was thus free to impose new requirements on Western Empire, so long as it insured the bank against the losses associated with that change. *See Winstar,* 518 U.S. at 870, 116 S.Ct. 2432. Because the present plaintiffs have available, and indeed have successfully pursued, contract-based claims, plaintiffs' expectations with regard to their property interests have not been contravened and the value of those interests have not been diminished. Accordingly, we are unable to conclude that plaintiffs have suffered a taking.

Plaintiffs argue, however, that the cases on which they chiefly rely—*Lynch,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434; *Prudential Ins. Co. v. United States,* 801 F.2d 1295 (Fed.Cir. 1986); and *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)—require us to reach a different conclusion. Yet, none of those cases challenges the basic principle that a litigant to whom a contract remedy is available has not been deprived of the rights conferred on him by contract. In *Lynch,* for instance, the plaintiff was eligible for just compensation because the right to the proceeds owed her as beneficiary under a government-issued war-risk insurance contract was abrogated by statute, leaving that plaintiff without recourse to a breach of contract claim. Indeed, the government in *Lynch* defended on the ground that the court had no jurisdiction since plaintiff's rights had essentially been eliminated.[24] *Lynch,* 292 U.S. at 575, 54 S.Ct. 840.

Similarly, plaintiffs direct our attention to *Prudential Ins. Co. v. United States,* 801 F.2d at 1300 n. 13, in which the court observed that a landlord suing for the government's breach of a leasing contract (the government had failed to quit the premises at the end of the lease term) "may have an alternate avenue of relief under the Takings Clause of the Fifth Amendment." Resort to the takings clause in that example, however, was warranted by the fact that the landown-

---

**24.** Other courts have characterized the *Lynch* holding as standing for the proposition that a taking occurs when the government "repudiates debts to save money." *Buse Timber & Sales, Inc. v. United States,* 45 Fed.Cl. 258, 263 (1999). Because a refusal to pay money owed under a contract essentially deprives a litigant of any contractual remedy (since a contract, by definition, is an agreement to pay money in the event of breach), we endorse the view that such a scenario constitutes a taking.

er had rights in the property separate and distinct from any rights conferred by contract. The principle that the right is intact so long as the remedy is available simply does not apply to rights that exist independent of a contract.

Nor does *Cleveland Bd. of Educ. v. Loudermill* support plaintiffs' position. The question presented in that case was whether the discharge of a public employee in accordance with the procedures applicable to his position was constitutionally permissible where those procedures afforded the employee neither an opportunity to respond to the charges against him nor the right to challenge his dismissal. In rejecting the state's contention that the employee's property right in his position was limited by the procedures afforded for its protection, the court repeated what it had earlier said in *Arnett v. Kennedy*, 416 U.S. 134, 167, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974): "While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguard." *Loudermill*, 470 U.S. at 541, 105 S.Ct. 1487. The Constitution's requirement of due process, the Court went on to say, demanded that the employee be given an opportunity to address the charges made against him before his discharge became effective. *Id.* at 547–48, 105 S.Ct. 1487.

Plaintiffs argue that *Loudermill* poses a direct parallel to our case. In the same way that an employee with a property interest in his position may not be deprived of that position without observance of the protections assured by the Due Process Clause of the Constitution, plaintiffs contend, so neither may a party with a property interest in his contract be deprived of the value of that contract without payment of the just compensation assured by the Takings Clause of the Constitution. And since, in plaintiffs' view, the remedy for a governmental taking is not provided by statute (or the common law of contract), but rather the Constitution itself, the question of what compensation is just cannot be resolved by reference to an external source of remedial law but rather by the plain terms of the Fifth Amendment.

Plaintiffs are correct that the Takings Clause—like the common law right to damages—forms the backdrop against which contractual relationships are created. They are equally correct that constitutional protections can be neither contracted away nor otherwise waived. That is not to say, however, that by rejecting the existence of a taking, we are somehow denying plaintiffs a larger, extra-contractual protection afforded by the Constitution. *Loudermill*, in our view, simply stands for the proposition that the Constitution provides a minimum level of protection to property rights, and that resort to a constitutional remedy is appropriate when the state has infringed on those rights. As discussed above, the Takings Clause would be implicated in the present case if the government had taken away the range of remedies associated with the vindication of a contract. That it has not done.

We turn then to two of plaintiffs' contentions that we believe merit additional attention. The first is the assertion that if plaintiffs recover less than "just compensation" (*e.g.*, because the court denies lost profits or because contract damages cannot include pre-judgment interest), the Fifth Amendment requires the government to make up the difference. The second is that the seizure of the bank itself represents a per se taking, quite apart from any taking of contract rights.

As to the first assertion, plaintiffs' rule proves too much. If we were to characterize as a taking the failure to award pre-judgment interest on a contract claim, we would essentially invalidate the law's proscription against the allowance of pre-judgment interest when not specified by contract or congressional act. 28 U.S.C. § 2516(a). Further, the congressional waiver of sovereign immunity only in those instances where interest is specifically provided for by contract or congressional act means that, in the absence of those circumstances, plaintiffs have no reasonable expectation—and hence no property interest—in the money they might otherwise have earned as interest on an earlier-paid judgment.

Similarly, the court's refusal to award lost profits does not transform plaintiffs' loss into

a taking. As discussed earlier, the court was not reasonably convinced that profits would have existed, so the failure to award them in no way diminishes the value of plaintiffs' contract rights.

■ As to the second assertion, we see no reason to contemplate a taking that does not involve the taking of contract rights. The law is clear that the seizure of a bank that fails to meet regulatory capital requirements does not constitute a taking. *See Branch*, 69 F.3d at 1575 ("The seizure and closure of the bank, once the bank became insolvent, did not constitute a taking."). While plaintiffs attempt to distinguish *Branch* on the ground that their contract afforded them a legitimate expectation that the laws governing the thrift would not change, the *Winstar* decision makes clear that plaintiffs had no entitlement to a specific regulatory treatment as distinguished from the entitlement to damages in the event of regulatory change. *Winstar*, 518 U.S. at 868–870, 116 S.Ct. 2432.[25]

Finally, because we hold that no property right has been taken, we do not reach the question, posed by the FDIC, of whether the private plaintiffs or the receiver should properly be considered the owner of the property right at stake.

## CONCLUSION

After more than ten years of litigation and four full months of trial, we now reach the end of plaintiffs' tenure before this court. While plaintiffs presented a strong and exceedingly well-argued case on behalf of their claim for lost profits, we were ultimately unable to conclude that the events depicted in the models were sufficiently rooted in the real-world experiences of the bank to allow

us to accept either the existence of damages or the amount of damages with any reasonable degree of certainty. Without that minimum guarantee of reliability, we were thus forced to conclude that plaintiffs' bid for lost profits must fail.

Nor, in the end, could we accept plaintiffs' contention that they have suffered a Fifth Amendment taking. Plaintiffs' contract entitled them to the very contract remedies they have come here to pursue—remedies which now afford them recovery in restitution of $15.12 million. Plaintiffs have been deprived of neither a property right nor a contract right.

Finally, we conclude that although the FDIC is the proper party to prosecute the bank's breach of contract claim, that authority does not extend to claims for money owed the government by the government. In addition, the award in restitution, essentially returning plaintiffs to their pre-contract position (without, of course, the not insubstantial benefit of the interest that would have been made on those sums) should be awarded directly to the shareholder-plaintiffs, and not to the FDIC.

For the reasons stated, the clerk is directed to enter judgment (i) granting the shareholder-plaintiffs restitution in the amount of $15,122,360 and (ii) dismissing the complaint of the plaintiff-intervenor, the Federal Deposit Insurance Corporation.

## ORDER DENYING PETITION FOR RECONSIDERATION

On November 27, 2000, defendant filed a petition pursuant to Rules 52(b), 59(a)(1) and 60(b)(6) of the court's rules seeking reconsideration of that part of our November 9, 2000

---

**25.** There the Court wrote:

It is important to be clear about what these contracts did and did not require of the Government. Nothing in the documentation or the circumstances of these transactions purported to bar the Government from changing the way in which it regulated the thrift industry. Rather, what the Federal Circuit said of the Glendale transaction is true of the Winstar and Statesman deals as well: "the Bank Board and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected" in the agreements between the parties. We read this promise as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence.... Restatement (Second) of Contracts § 264, Comment a. "Such an agreement," according to the Restatement, "is usually interpreted as one to pay damages if performance is prevented rather than one to render a performance in violation of law."

decision upholding the FDIC's standing to pursue breach of contract damages on behalf of Western Empire Savings and Loan Association—a failed thrift institution. Specifically, defendant contends that, in its capacity as manager of the FSLIC Resolution Fund, the FDIC is not invested with the powers of a receiver and thus lacks authority to assert any claim in a representative capacity. Additionally, defendant raises again an earlier-presented argument: that an action brought by the FDIC in this court—even if otherwise permissible—would amount to an intra-governmental dispute and hence be ineligible for adjudication on that ground alone.

■ The request for reconsideration lacks merit. Title 12 of the United States Code, section 1821a(a)(4)(1994) states that "the Corporation [the FDIC] shall have all rights, powers, and duties to carry out the Corporation's duties with respect to the assets and liabilities of the FSLIC Resolution Fund that the Corporation otherwise has under this chapter." Among the powers which the FDIC "otherwise has under this chapter" is the power "to act as receiver." 12 U.S.C. § 1819(a). *See also* 12 U.S.C. §§ 1821(c), 1823(d)(3). Accordingly, there can be no doubt that in the proper discharge of its duties as manager of the FSLIC Resolution Fund, the FDIC can—indeed must—discharge the fiduciary responsibilities owed by a receiver to the creditors of a failed financial institution.

■ Nor can there be any doubt that, in pursuing the discharge of these duties through the filing of a breach of contract action in this court, the FDIC is not embarking upon an intra-governmental dispute. A recovery on such a claim would have been exclusive of the so-called receivership deficit claim; hence any recovery would have been for the benefit of general creditors and shareholders and not for the benefit of the United States or any agency thereof.

The petition for reconsideration is denied.